Volume 1 of 3

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SCOTT LYNN PINHOLSTER,
          *Petitioner-Appellee,*

v.

ROBERT L. AYERS, Jr., Warden,
          *Respondent-Appellant.*

No. 03-99003

D.C. No.
CV-95-06240-GLT

SCOTT LYNN PINHOLSTER,
          *Petitioner-Appellant,*

v.

JEANNE S. WOODFORD, of the
California State Prison at San
Quentin,
          *Respondent-Appellee.*

No. 03-99008

D.C. No.
CV-95-06240-GLT

OPINION

Appeal from the United States District Court
for the Central District of California
Gary L. Taylor, District Judge, Presiding

Argued and Submitted
June 23, 2009—Seattle, Washington

Filed December 9, 2009

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Stephen Reinhardt, Pamela Ann Rymer, Andrew J. Kleinfeld,
Kim McLane Wardlaw, William A. Fletcher,
Richard A. Paez, Marsha S. Berzon, Jay S. Bybee, and
Milan D. Smith, Jr., Circuit Judges.

16039

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Chief Judge Alex Kozinski

---

**COUNSEL**

Kristofer Jorstad, Deputy Attorney General, Los Angeles, California, for the respondent-appellant, cross-appellee.

Sean K. Kennedy, Federal Public Defender, Los Angeles, California, for the petitioner-cross appellant/appellee.

---

**OPINION**

MILAN D. SMITH, JR., Circuit Judge:

Scott Lynn Pinholster (Pinholster) was sentenced to death after a jury convicted him of double murder with a knife in the course of a home robbery and burglary. After exhausting his state remedies, Pinholster sought a writ of habeas corpus in federal district court in which he alleged, among other claims, ineffective assistance of counsel at both the guilt and penalty phases of his trial. Applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, in its final ruling, the district court upheld Pinholster's conviction, but granted habeas relief on his death sentence because the court found that trial counsel's deficient performance at the penalty phase of the trial unconstitutionally prejudiced Pinholster's defense.

A three-judge panel of this court affirmed the district court's guilt phase determination but reversed its grant of habeas relief on the penalty phase. *Pinholster v. Ayers* (*Pinholster II*), 525 F.3d 742 (9th Cir. 2008). Sitting en banc, we affirm the district court. Although the denial of Pinholster's guilt phase ineffective assistance claim was appropriate, his penalty phase ineffective assistance claim warrants habeas relief even when considered under AEDPA's deferential standards.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. The Prosecution's Guilt Phase Case

As recounted in the California Supreme Court's opinion on direct appeal, Art Corona (Corona), an accomplice in the commission of most of the crimes charged, served as the prosecution's primary witness. *Pinholster v. Ayers* (*Pinholster I*), 824 P.2d 571, 582 (Cal. 1992). At trial, Corona testified that he, Pinholster, and Pinholster's co-defendant, David Brown (Brown), were attending a party at Pinholster's apartment on the evening of January 8, 1982, when Pinholster solicited them to rob Michael Kumar, a local drug dealer. *Id.* Pinholster told the others that he anticipated forcing entry into Kumar's home and taking drugs and money. *Id.*

As Corona drove towards Kumar's house, Pinholster directed Corona to stop at Lisa Tapar's residence. *Id.* Pinholster wanted Tapar to help with the robbery, but when he knocked on her door, she refused him entry and shut the door in his face. *Id.* In response, Pinholster took a buck knife from

---

[1]The California Supreme Court's opinion in *People v. Pinholster* (*Pinholster I*), 824 P.2d 571, 581-87 (Cal. 1992), and our three-judge panel's majority opinion in *Pinholster v. Ayers* (*Pinholster II*), 525 F.3d 742, 749-56 (9th Cir. 2008), thoroughly summarize the detailed facts in this case. With independent verification, we reiterate here only those facts material to our disposition.

his belt, stabbed it through the door, and scratched a swastika and thunderbolts into the hood of her car. *Id.* Tapar, her father, and a third witness corroborated Corona's description of this incident. *Id.*

When Pinholster, Brown, and Corona arrived at Kumar's residence and found no one home, they broke in and ransacked it, taking a small amount of marijuana from a bedroom and spilling a green substance in the kitchen. *Id.* at 582-83. While they were searching the house, they heard a car pull up and saw Thomas Johnson and Robert Beckett (Kumar's housesitters) approach, one of whom opened the front door and shouted that he would call the police. *Id.* at 583. Pinholster, Brown, and Corona all moved towards the rear door to leave, but Johnson and Beckett came to the back and blocked their way. *Id.* When Johnson tried to enter the house, Pinholster struck him in the chest three or four times, demanding drugs and money. *Id.* Johnson dropped his wallet on the ground and obeyed Pinholster's order to sit down. *Id.* Pinholster then attacked Beckett as he approached, stabbing him in the chest. *Id.* Beckett dropped to the ground, and Pinholster kicked him in the head repeatedly, took the wallet from Beckett's pocket, and also picked up Johnson's wallet. *Id.* Brown then stabbed Johnson in the chest, "bury[ing] his knife to the hilt." *Id.* Johnson and Beckett died of their wounds.

Pinholster, Brown, and Corona then left Kumar's house and drove back to Pinholster's apartment. *Id.* On the way, Brown and Pinholster commented that they had "gotten them good." *Id.* Pinholster washed his knife upon his return, and the three split the proceeds of the robbery: $23 and a quarter-ounce of marijuana. *Id.*

Although Pinholster called Corona the day after the crime and told him to "lie low," Corona turned himself in two weeks later and gave a statement to police. *Id.* According to Corona, Pinholster threatened to blow him up on his way to court if Corona refused to invoke his right against self-incrimination,

and testified against him. *Id.* Nevertheless, Corona testified against Pinholster and Brown and, at the end of the trial, pleaded guilty to burglary. *Id.*

Corona's wife, Casey Corona, who was at Pinholster's apartment when Pinholster, Brown, and her husband returned from Kumar's residence, corroborated her husband's testimony about the initiation, execution, and aftermath of the crime. *Id.* She testified that she watched Pinholster wash blood from his knife, and that she heard him say, "It had to be done the way it was done. We had to do what we had to do." *Id.*

The prosecution also presented forensic evidence that Pinholster had been in Kumar's home after the ransacking. *Id.* According to Corona's testimony, Pinholster wore boots and jeans on the evening of the murders. *Id.* During their search of Pinholster's apartment, police discovered boots, a towel, and a pair of jeans, all with microscopic blood traces on them. *Id.* While the boots and the towel tested positive for human blood, the jeans were not tested to determine whether the blood on them was also human. *Id.* at 583-84. Additionally, when police arrested Brown, he was carrying a buck knife with human blood traces close to the hilt and with dimensions that matched a stab wound in Johnson's body. *Id.* at 584. Police also discovered human blood on the inside forearm of Corona's shirt sleeve, but did not find any blood on his knife. *Id.*

## B.   Pinholster's Guilt Phase Case

During the guilt phase of his trial, Pinholster testified on his own behalf and presented an alibi defense. *Id.* at 584-85. He boasted that he had committed hundreds of robberies over the previous six years, using a gun, but never a knife, to victimize drug dealers. *Id.* at 584. Although he admitted a prior kidnapping conviction with the use of a knife, he claimed that he pleaded to the aggravating circumstance only as part of a plea

bargain. *Id.* Pinholster also admitted going to Kumar's house and taking marijuana from the bedroom, but denied ransacking the residence or killing anyone. *Id.* Pinholster asserted that Corona had asked him for Kumar's address that night, and that Corona had gone to Kumar's house later to steal some additional drugs and money. *Id.* at 585.

### C. The Jury's Guilt Phase Verdict

At the close of the guilt phase, the jury convicted Pinholster of first-degree murder and found that the following two multiple-murder special-circumstance allegations were true, making him eligible for a death sentence: first, he committed each murder during the course of a robbery and a burglary; and second, he personally used a knife. *Id.* at 581. The jury also convicted him of burglary, robbery, and intentional infliction of great bodily injury through personal use of a knife. *Id.*

### D. The Prosecution's Penalty Phase Case

At the penalty phase of the trial, Pinholster stipulated that he had a prior kidnapping conviction with the use of a knife, and that he was identified as having held the knife to the victim's throat. *Id.* at 586. Pinholster also stipulated to numerous disciplinary infractions during his prison term for the kidnapping, such as throwing urine at guards, threatening to stab guards, and threatening to throw guards from an upper tier of the prison. *Id.* The prosecution presented testimony that Pinholster had a violent history with law enforcement, including: an outburst in court as a juvenile during which he threatened everyone in the room and struck a bailiff; resisting arrest as an adult by kicking one police officer in the back of the head while allegedly faking an epileptic seizure; making threats and kicking the X-ray machine when taken to the hospital after his arrest; starting a racial fight while in custody and kneeing an officer in the groin; and various other incidents of violence or threats of future violence while in custody, includ-

ing death threats. *Id.* In addition, the prosecution presented testimony that Pinholster was a well-known member of the juvenile gang community. Theodore Mesquita testified that Pinholster had once cut Mesquita's arm with a razor, afterwards pursuing him on foot to the hospital where Mesquita required fifty stitches to close his wound. *Id.* at 586-87. Cathy Ann Smith, Pinholster's ex-wife, also testified that Pinholster once broke her jaw while seeming to have an epileptic seizure. *Id.* at 587.

### E.  Pinholster's Penalty Phase Case

Pinholster had been represented by, and later rejected, several different court-appointed attorneys to represent him in this case before he petitioned the court to permit him to represent himself, which he did from March 17 to July 13, 1983. *Pinholster II*, 525 F.3d at 751 n.5. Pinholster later reconsidered, however, and the Los Angeles County Superior Court appointed Harry W. Brainard and Wilbur G. Dettmar to represent him during the guilt and penalty phases of his trial. *Id.*

On March 22, 1983, the State mailed a letter to Pinholster at the Los Angeles County Jail, informing him that the prosecution planned to offer aggravating evidence at the penalty phase. *Id.* at 751. When the guilt phase ended on April 24, 1984, Pinholster's counsel moved to exclude the aggravating evidence on the ground that the prosecution had failed to provide reasonable notification under California Penal Code § 190.3. *Id.* The state trial court denied the motion, concluding that Pinholster had received actual notice of the State's intention to seek the death penalty during the time period in which he represented himself. *Id.* at 751, 751 n.6. In doing so, however, the court advised defense counsel that it would grant a defense motion to continue the penalty phase of the trial to allow Pinholster's counsel to prepare a mitigation case. *Id.* at 751. Pinholster's counsel declined the offer, stating that they did not believe that more time "would make a great deal of difference."

Pinholster's counsel had earlier consulted with Dr. John M. Stalberg, a psychiatrist, who examined Pinholster on March 11, 1984, about a week after the guilt phase of the trial began. Dr. Stalberg had received a copy of Pinholster's police reports as well as a copy of his 1978 probation report, and examined Pinholster himself for one to two hours. He concluded that Pinholster "did not manifest any significant signs or symptoms of mental disorder or defect other than his antisocial personality disorder by history." Based on his examination, Dr. Stalberg opined that Pinholster was cognitively functional, without brain damage, and noted that while Pinholster allegedly had epilepsy, he had not had a seizure for the past year and was not on medication. Pinholster's trial counsel did not contact Dr. Stalberg again, nor did they consult with any other mental health expert.

Pinholster's counsel billed a total of only 6.5 hours in preparation for the penalty phase of the trial.[2] Brainard stated that while "Mr. Dettmar was primarily responsible for psychiatric, psychological, and other mental health issues in the case," he had "no recollection of Mr. Dettmar having secured or reviewed any of [Pinholster's] medical records, nor did [Brainard] see any [of them]." "So far as [Brainard] recollect[ed], neither Mr. Dettmer nor [Brainard] interviewed any of Scott's previous medical providers" even though they were "aware prior to trial that Dr. Dubin and other health care providers

---

[2]The record shows that counsel billed 1.5 hours to "[s]tart prep. for penalty phase" on April 11, 1984, 3.0 hours for "[p]rep. penalty phase and conf. with Mrs. Brashear" on April 25, 1984, and 2.0 hours for "[p]rep. penalty phase" on April 26, 1984. The dissent guesses that other records —which do not mention penalty phase preparation—might be penalty preparation in disguise (or, worse, that "perhaps [counsel] was not diligent about time records."). Diss. at 16125. Despite our dissenting colleague's well-known flair for "creative" writing, it is not appropriate for a federal appellate court to conjure up evidence that does not exist, especially when we have counsel's own testimony that they did not anticipate a death penalty hearing, and thus did not prepare for it. *See Pinholster II*, 525 F.3d at 751.

had treated Mr. Pinholster for seizure disorder." In the same vein, Brainard admitted:

> I do not recall interviewing or attempting to interview [Pinholster's] family members or any other persons regarding penalty phase testimony, except Mrs. Brashears [sic], defendant's mother. I have no recollection of seeing or attempting to secure [Pinholster's] school records, juvenile records, medical records, or records of prior placements. I have no recollection of interviewing or attempting to interview [Pinholster's] former teachers, counselors, or juvenile officers.

The limited preparation that was done included interviewing Pinholster's mother, Burnice Brashear (Brashear), who later became the sole defense witness called at the proceeding. Brashear testified that Pinholster had several accidents as a small child. When Pinholster was two years old, Brashear accidentally ran over him with her car, badly injuring his head. When Pinholster was four or five, Brashear was involved in a car accident in which Pinholster's head went through the windshield. Brashear also testified that Pinholster did not get along well with his step-father, who was a strict disciplinarian to the point of abuse at times. She stated that Pinholster was disruptive in the classroom as a child, but "did much better" when sent to an academically handicapped class in third or fourth grade.

Brashear further testified that when Pinholster was about ten, she took him to a psychiatrist who recommended that he be placed in a mental institution. She rejected that recommendation because she "didn't think he was that far gone." Meanwhile, Pinholster began stealing things and playing "Robin Hood" around the neighborhood, which indicated to her that "something was not working right." Pinholster eventually was sent to juvenile hall as a result of these thefts. As an adult, Pinholster had physical problems that included epilepsy,

which Brashear understood to be the result of his being "beaten up pretty severely in jail" when he was eighteen. She also stated that he was on medication for that epilepsy, but that she did not know if he received the recommended medication while in prison.

Brashear then testified that her other children were "basically very good children," although they had also been in trouble with the law. She specifically mentioned DUI charges for both her younger son and her "wild girl" daughter. Brashear emphasized, however, that her other children were not like Pinholster, who was a "show-off" and had been in and out of mental institutions from the time he was twelve. She stated that the doctors had found "something wrong here outside of just bad behavior." Brashear also testified that Pinholster "never really wanted for anything at home too much," having had "everything normally materialwise that most people have," and that although the family "didn't have lots of money," he always had "a roof over his head" and "decent clothes." Finally, she indicated that although Pinholster was "a perfect gentleman" at home, his long stay in state prison had affected him so that it was difficult for him to remember that he could open doors and walk outside.

### F. The Jury's Penalty Phase Verdict and the State Trial Court's Sentencing of Pinholster

Following Brashear's testimony and two and a half days of deliberation, the jury returned a death verdict on each of the two murder counts on May 7, 1984, *Pinholster II*, 525 F.3d at 751-52, and the state trial court sentenced Pinholster accordingly.

### G. The State Habeas Petition

After the California Supreme Court set aside one multiple-murder special circumstance but otherwise affirmed the judgment on direct appeal, Pinholster filed a state habeas petition

in which he alleged, among other claims, ineffective assistance of counsel at both the guilt and penalty phases of his trial.

In support of his guilt phase ineffective assistance claim, he presented evidence that his counsel had failed to test the forensic evidence independently and to move to exclude prior bad acts evidence introduced by the prosecution. Pinholster also presented evidence that his counsel were ineffective during the penalty phase by failing to conduct an adequate investigation into his mental health. Specifically, he claimed that Dr. Stalberg, the expert consulted by his attorneys, had "unreasonably, incompetently and perfunctorily arrived at unsupported conclusions based upon inadequate investigation and analysis." presented the testimony of Dr. George Woods, who also condemned Dr. Stalberg's report and offered an alternative analysis. Dr. Woods indicated that Pinholster suffered from bipolar disorder, and that at the time of the murders, Pinholster was in the throes of an epilepsy-related seizure. Dr. Woods also opined that Pinholster was incompetent to stand trial.

The California Supreme Court issued an order to show cause on the penalty phase ineffective assistance claim, but then vacated the order as improvidently granted and denied the petition "on the substantive ground that it is without merit."

## H.   The Federal Habeas Petition

Pinholster filed a federal habeas petition on April 22, 1997. In this petition, Pinholster abandoned use of Dr. Woods' testimony and instead presented the testimony of Dr. Stalberg, who stated that if trial counsel had provided him with Pinholster's family history, particularly as related to medical disorders, he would have made further inquiry "before concluding that [Pinholster] had merely a personality disorder." After the parties stipulated that the petition included new material facts

and unexhausted claims, the district court dismissed the unexhausted claims and held the fully exhausted petition in abeyance.

The California Supreme Court denied Pinholster's second state habeas petition "on the substantive ground that it is without merit."[3]

The case then returned to federal district court, where Pinholster requested an evidentiary hearing. *Pinholster II*, 525 F.3d at 754. Applying pre-AEDPA law, the court denied an evidentiary hearing and granted summary judgment to the State on Pinholster's guilt phase ineffective assistance claims, *id.* at 748, 754 n.9, 756, but granted an evidentiary hearing on Pinholster's penalty phase ineffective assistance claim, *id.* at 754. Pinholster prepared a declaration by Dr. Stalberg to serve as direct testimony for that hearing. During Dr. Stalberg's subsequent deposition, however, he testified that nothing in the information compiled by the defense team altered his basic opinion that Pinholster "suffers from Antisocial Personality Disorder." Defense counsel then dropped Dr. Stalberg from the case and substituted two new experts, Dr. Donald Olson and Dr. Sophia Vinogradov. *Pinholster II*, 525 F.3d at 755.

---

[3]The dissent seems mesmerized by the fact that the California Supreme Court twice denied Pinholster's state habeas petitions. Diss. at 16102, 16108-09, 16145-48. It is true that the postcard denial, issued by the same justices who had previously denied Pinholster's petition, was technically a second look. However, contrary to the dissent's suggestion, the level of deference is not measured by the number of times that habeas relief has been denied. If that were the case, then the Supreme Court might have exercised greater deference in *Porter*, *Wiggins*, and *Rompilla*, where their respective state trial and supreme courts had both denied postconviction relief. Instead, the Court granted habeas relief anyway, because collateral habeas review is not concerned with the number of times the state did or did not grant relief. *See Porter v. McCollum*, 558 U.S. ___, No. 08-10537 (2009) (per curiam); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005).

At the evidentiary hearing, as discussed in further detail in section III.B.3.b. of this opinion, Pinholster presented mitigation evidence that his counsel had failed to present at the penalty phase of his trial. This evidence included testimony that his childhood upbringing was much worse than his mother had described. His biological father was an unemployed drunk who was unfaithful to his mother, and the couple divorced shortly after Pinholster's birth. His father had mood swings and fits of anger, and was eventually diagnosed as paranoid with narcissistic personality disorder. After his parents' divorce, Pinholster's mother generally did not have enough money to provide for the children and, when she had money, usually spent it on herself. Pinholster's grandmother, who often watched the children while his mother worked, used to "beat the hell out of" him because he resembled his father.

Pinholster's step-father came into his life when Pinholster was five years old, and was, according to Pinholster's evidence, more than simply a strict disciplinarian. The step-father beat the children with his fists, a belt, and—on at least one occasion—a two-by-four board. Otherwise, he was "completely indifferent" to them. The additional evidence also showed that the family did not get enough to eat and lived in crime-ridden neighborhoods, and that the children ran wild, frequently trashed apartments, and lacked any moral or other discipline.

Regarding his schooling, Pinholster presented testimony that he was a nice and intelligent child, but restless and hyperactive, unable to sit still and in need of a great deal of attention. Although his fourth-grade teacher arranged several appointments with his mother to discuss the situation, his mother generally failed to attend or, if she did attend, remained non-responsive throughout the appointment. After Pinholster had been arrested three different times when he was ten or eleven years old, the juvenile court placed him in a home for emotionally disturbed boys, after which he stayed

at a state mental hospital for about five months. Although the psychiatric discharge report recommended his placement in a good foster home, that suggestion went unheeded. In seventh grade, Pinholster began using drugs, including marijuana, barbiturates, alcohol, acid, and cocaine. He became addicted to heroin while in the eighth grade. Thereafter, he was sent to juvenile hall at least nine times and to at least three schools for troubled boys, and was finally sent to prison at age nineteen following a conviction for kidnapping.

Pinholster also provided further details of his family's criminal and mental history. His older brother, Alvin, was charged with the rape and sodomy of a fourteen-year-old, and was later diagnosed with schizophrenia and found to be incompetent to stand trial. Shortly after Pinholster's parole from his kidnapping sentence, Alvin committed suicide. Pinholster's younger brother, Terry, was diagnosed with mild depression and abused drugs, and his half-sister, Tammy, began drinking alcohol when she was eleven. When Tammy was seventeen, she was arrested with her boyfriend for sexually assaulting a fourteen-year-old girl. Guy, a half-brother, was diagnosed with manic depression, and Gary, another half-brother, was an alcoholic with severe mood swings.

Pinholster's experts also testified that he had suffered brain damage that explained his aggressive, impulsive, and antisocial behavior. Dr. Olson, a pediatric neurologist, concluded that Pinholster sustained frontal-lobe injuries from the two childhood car accidents, as evidenced by the facts that Pinholster suffered from epilepsy and that he had an abnormal electroencephalogram (EEG) when he was nine years old. Dr. Vinogradov, a psychiatrist, diagnosed Pinholster with organic personality disorder brought on by childhood and later-life head trauma, and ruled out a diagnosis of antisocial personality disorder.

In light of this evidence, and applying pre-AEDPA law, the district court granted Pinholster's habeas petition based on the

"inadequacy of defense counsel in investigating and present-ing mitigation evidence at the penalty phase" of his trial. The same day the district court filed its decision, however, the Supreme Court issued its opinion in *Woodford v. Garceau*, which held that AEDPA applies in capital habeas cases so long as the petition was filed after April 24, 1996. 538 U.S. 202, 207 (2003). In response, the district court issued an addendum to its order, concluding that Pinholster timely filed his federal habeas petition; that Pinholster was entitled to an evidentiary hearing under AEDPA; and that AEDPA did not affect the grant of habeas relief because "[t]he California Supreme Court did not adjudicate Pinholster's claim that counsel was ineffective for failing to investigate and present mitigating evidence at the penalty phase." The parties cross-appealed, and a three-judge panel of our court affirmed the district court's guilt phase ineffective assistance determina-tion, but reversed its grant of habeas relief on the penalty phase ineffective assistance claim. *Pinholster II*, 525 F.3d at 773. Upon the affirmative vote of a majority of the eligible judges in our court, we took the case en banc.

## II.   JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 2253. We review a district court's decision to grant or deny a writ of habeas corpus de novo, *Lewis v. Mayle*, 391 F.3d 989, 995 (9th Cir. 2004), and the district court's findings of fact for clear error, *Bonin v. Calderon*, 59 F.3d 815, 823 (9th Cir. 1995). Because Pinholster filed his federal habeas petition in 1997, the provisions of AEDPA govern his claims. *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).

AEDPA provides that a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned decision regarding a claim, *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005), and "the phrase '[adjudicated] on the merits' requires that the [state court's] grant or denial rest on substantive, rather than procedural, grounds," *Lambert v. Blodgett*, 393 F.3d 943, 966 (9th Cir. 2004) (reading in pari materia with 28 U.S.C. § 2254(d)).

"Clearly established" federal law consists of holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Terry Williams v. Taylor*, 529 U.S. 362, 379-84 (2000). Habeas relief is unavailable if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Id.* at 381. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). A state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Terry Williams*, 529 U.S. at 405-06.

Under the "unreasonable application" prong, a federal court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but

unreasonably applies it to the facts of the particular . . . case," or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. To show that a state court's application of Supreme Court precedent was "unreasonable," the petitioner must establish that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409-10.

In this case, although both parties agree that AEDPA applies, they disagree over the *level* of deference owed to the California Supreme Court's decision in light of its summary nature. Pinholster argues that, because the court found only that there was insufficient evidence to make a prima facie claim for relief and allegedly never reached the actual merits of the claim, we review the court's decision without deference. The State, by contrast, argues that because the court's summary denial of Pinholster's claim was an adjudication on the merits, we apply the usual deference required by AEDPA.

Under our precedent, the California Supreme Court's denial of Pinholster's petition for writ of habeas corpus "on the substantive ground that it is without merit," *Pinholster II*, 525 F.3d at 754, constitutes a decision on the merits of his federal claim. *See Hunter v. Aispuro*, 982 F.2d 344, 347-48 (9th Cir. 1992) (noting that "the California Supreme Court's denial of a habeas petition without comment or citation constitute[s] a decision on the merits of the federal claims") (citing *Harris v. Superior Court*, 500 F.2d 1124, 1127-29 (9th Cir. 1974) (en banc)); *Gaston v. Palmer*, 417 F.3d 1030, 1038 (9th Cir. 2005) (recognizing that "[w]e construe 'postcard' denials such as these to be decisions on the merits" (citing *Hunter*, 982 F.2d at 348)). The Supreme Court has not addressed the question of the proper measure of deference that applies under AEDPA where, as here, a state court provides no rationale for its decision denying habeas relief on the merits, and where, as here, no other state court decision has addressed the claims at

issue. We have held, however, that in such situations, we "perform an 'independent review of the record' to ascertain whether the state court decision was objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (quoting *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000)); *see also Cooper v. Brown*, 510 F.3d 870, 921 (9th Cir. 2007); *Lewis v. Mayle*, 391 F.3d at 996. Such "[i]ndependent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.[4]

## III. DISCUSSION

Pinholster argues that the California Supreme Court's summary denial of his Sixth Amendment claims of ineffective assistance of counsel at the guilt and penalty phases of his trial was objectively unreasonable under AEDPA. Because the California Supreme Court issued its last decision in October 1997, we apply, as the relevant "clearly established Federal law" at that time, the Supreme Court's familiar two-part standard for analyzing ineffective assistance claims set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Terry Williams*, 529 U.S. at 391 (noting that "[i]t is past question that the rule set forth in *Strickland* qualifies as clearly established Federal law, as determined by the Supreme Court of

---

[4]We need not determine in this case whether our prior decisions properly held that AEDPA deference applies to silent state court decisions such as the denial at issue here, or whether that standard of deference applies to claims involving new evidence introduced on federal habeas. *See, e.g.*, *Brown v. Smith*, 551 F.3d 424, 429 (6th Cir. 2008) (reviewing an ineffective assistance of counsel claim without AEDPA deference in light of new evidence introduced by a diligent petitioner). Whether we review the state court's decision de novo or for objective unreasonableness with an independent review of the record, we would grant the writ as to Pinholster's penalty phase claim and deny the writ as to his guilt phase claims. Accordingly, we will assume for purposes of this opinion that the stricter unreasonableness standard applies.

the United States," and that "[the] Court's precedent dictated that the Virginia Supreme Court apply the *Strickland* test at the time that court entertained Williams' ineffective-assistance claim" (internal quotation marks omitted)).

In doing so, we note that the Court has repeatedly applied *Strickland*'s ineffective assistance standard to cases where, as here, the trial occurred before *Strickland* was decided on May 14, 1984.[5] In *Burger v. Kemp*, 483 U.S. 776, 777, 794 (1987), for example, the Court applied the *Strickland* standard in evaluating trial counsel's performance where the habeas petitioner was convicted and sentenced to death on January 25, 1978, over six years before *Strickland* was decided. Additionally, in *Woodford v. Visciotti*, 537 U.S. 20, 21, 22 (2003) (per curiam), the Court applied the *Strickland* standard where the petitioner was convicted and sentenced a year before *Strickland* was decided, *see People v. Visciotti*, 825 P.2d 388 (Cal. 1992), and where, as here, the petitioner's ineffective assistance claims were governed by AEDPA, *see* 537 U.S. at 21.

Given that AEDPA deals only with the state court's adjudication of a claim, it does nothing to alter the standard of care to which trial counsel is held. At the same time, because Pinholster's conviction was not final when *Strickland* was decided, he is entitled to rely on *Strickland* in challenging his conviction. *See Teague v. Lane*, 489 U.S. 288, 304-05 (1989); *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987).

**[1]** To prevail under *Strickland*, the petitioner must first "show that counsel's performance was deficient." 466 U.S. at 687. To be "deficient," counsel's trial performance must be objectively unreasonable "under prevailing professional norms" and under "all the circumstances" of the particular case. *Id.* at 687-88. Our inquiry into "counsel's performance [is] highly deferential," and "[a] fair assessment of attorney performance requires that every effort be made to eliminate

---

[5]As previously noted, Pinholster's trial concluded on May 7, 1984.

the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Given the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," the petitioner carries the burden of showing that the challenged action could not be viewed as sound trial strategy. *Id.*

**[2]** "Second, the [petitioner] must show that the deficient performance prejudiced the defense." *Id.* at 687. For us to find prejudice, "[i]t is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. "On the other hand, . . . [the petitioner] need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* Rather, "[t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

**[3]** Following AEDPA's enactment, the Supreme Court has reiterated that we apply a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." *Rompilla v. Beard*, 545 U.S. 374, 393-94 (2005) (O'Connor, J., concurring). In doing so, however, the Court has instructed that its post-AEDPA ineffective assistance of counsel decisions are clearly relevant for the purpose of informing the interpretation and application of the standards originally announced in *Strickland*.

In *Wiggins v. Smith*, for example, where the petitioner's trial originally took place in 1989, the Court observed that "[o]ur opinion in [*Terry*] *Williams* . . . is illustrative of the proper application of [*Strickland*'s] standards." 539 U.S. 510, 514, 522 (2003). The *Wiggins* Court explained that "[w]hile [*Terry*] *Williams* had not yet been decided at the time the Maryland Court of Appeals rendered the decision at issue in

[*Wiggins*]," the Court's reliance on *Williams* was nonetheless proper because "Williams' case was before [the Court] on habeas review," and because the Court "made no new law in resolving Williams' ineffectiveness claim" but merely applied the established holding in *Strickland*. *Id.* at 522. The *Wiggins* Court thus reached its conclusion that counsel rendered ineffective assistance under *Strickland* in part by distinguishing the facts in *Wiggins* from those in *Terry Williams*:

> [I]n contrast to the petitioner in *Williams* . . . , Wiggins does not have a record of violent conduct that could have been introduced by the State to offset this powerful mitigating narrative. As the Federal District Court found, the mitigating evidence in this case is stronger, and the State's evidence in support of the death penalty far weaker, than in *Williams*, where we found prejudice as the result of counsel's failure to investigate and present mitigating evidence.

539 U.S. at 537-38 (citation omitted). Similarly, in *Rompilla*, decided in 2005, the Court repeatedly cited *Terry Williams* and *Wiggins* in reversing an ineffective assistance case in which the state trial took place in 1988 and in which the state postconviction decision issued in 1998. *See Rompilla*, 545 U.S. at 378-93, 387 n.7; *Commonwealth v. Rompilla*, 653 A.2d 626, 628 (Pa. 1995). Most recently, in *Porter v. McCollum*, the Court relied on post-AEDPA cases in determining the "prevailing professional norms" at the time of Porter's trial in 1988. 558 U.S. ___, No. 08-10537, slip op. at 9-10 (2009) (per curiam).

**[4]** Thus, we hold that we are required to apply the instructions contained in the Supreme Court's post-AEDPA ineffective assistance of counsel cases to inform and construe the meaning of *Strickland* as it applies to Pinholster's trial and postconviction proceedings. In other words, *Terry Williams*, *Wiggins*, *Rompilla*, and *Porter* help illuminate which applications of *Strickland* are unreasonable under AEDPA.

## A. The Guilt Phase

[5] Our three-judge panel unanimously held that, even assuming that counsel's representation at the guilt phase of the trial constituted deficient performance, the district court properly denied an evidentiary hearing and granted summary judgment in favor of the State because Pinholster failed to make a colorable showing of prejudice. *Pinholster II*, 525 F.3d at 757, 761, 775, 777; *see also Strickland*, 466 U.S. at 697 (stating that a court may assume ineffective assistance to resolve a claim on the basis of prejudice). We reach the same conclusion, and adopt Judge Fisher's discussion as to prejudice in the full paragraph at *Pinholster II*, 525 F.3d at 777, which best summarizes the panel's prejudice holding. We find no useful purpose would be served by repeating extensive work already contained in the Federal Reporter. On these grounds, we affirm the district court's denial of Pinholster's request for an evidentiary hearing and denial of habeas relief on his claim of ineffective assistance of counsel at the guilt phase.

## B. The Penalty Phase

In its appeal, the State argues that the California Supreme Court was not objectively unreasonable in summarily denying Pinholster's claim that his attorneys rendered ineffective assistance at the penalty phase of his trial by failing to investigate, to discover, and to introduce readily available mitigation evidence. For the following reasons, and based on our independent review of the record, we disagree. *See Himes*, 336 F.3d at 853.

### 1. Federal Evidentiary Hearing

The State contends that the district court abused its discretion in granting Pinholster a federal evidentiary hearing on his penalty phase ineffective assistance claim because the court allegedly failed to consider whether Pinholster properly

developed a factual basis for the claim in the California Supreme Court. As a result, the State argues, the district court improperly reached its decision to grant habeas relief based on evidence that was not before the state court.

**[6]** The State's contention regarding the federal evidentiary hearing is unavailing. The State is correct that when a petitioner challenges a state habeas court's *factual* conclusions, the relevant evidence is restricted to that presented to the state habeas court: Under AEDPA, federal postconviction relief is available on such claims only if the state habeas court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts *in light of the evidence presented in the State court proceeding.*" 28 U.S.C. § 2254(d)(2) (emphasis added).

**[7]** Here, however, Pinholster challenges the California Supreme Court's *legal* conclusions. Such claims are governed not by § 2254(d)(2), but by § 2254(d)(1). As noted above, under § 2254(d)(1), relief is available if the state habeas court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Significantly, Congress omitted "in light of the evidence presented in the State court proceeding" from § 2254(d)(1), while including that language in § 2254(d)(2). This omission strongly indicates that Congress did not intend to restrict the inquiry under § 2254(d)(1) only to the evidence introduced in the state habeas court, or to have federal courts imply any such restriction.

In addition, AEDPA has an independent provision that expressly restricts a habeas petitioner's ability to introduce new evidence in federal court. *See* 28 U.S.C. § 2254(e)(2). That restriction applies when the petitioner was not diligent in seeking to develop the new evidence in state court. *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004). Neither § 2254(d)(1) nor § 2254(e)(2) contains any language indicat-

ing that evidence properly introduced under § 2254(e)(2) is irrelevant when applying § 2254(d)(1). On the contrary, § 2254(e)(2) establishes that, when drafting AEDPA, Congress was aware that federal habeas petitioners sometimes rely on evidence not presented in the state habeas court, and that Congress responded to that issue with an *explicit* statutory restriction on the introduction of such evidence.

The legal backdrop against which Congress drafted and enacted AEDPA also informs our construction of § 2254(d)(1). Historically, a federal habeas petitioner could rely on new evidence as long as that evidence did not so alter the underlying claims as to render them unexhausted. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986). As § 2254(e)(2) demonstrates, Congress included specific language in AEDPA when it intended to change that traditional practice. Congress's failure to include any such language in § 2254(d)(1), by contrast, demonstrates that Congress did *not* intend for § 2254(d)(1) to imply any additional departure from the *Vasquez* rule beyond that contained in § 2254(e)(2).

**[8]** Supreme Court precedent also fails to support the State's position on this issue. In *Michael Williams*—the Court's most significant decision regarding evidentiary development in federal habeas proceedings under AEDPA—the Court did not tie the right to a federal evidentiary hearing to a prior determination that the state habeas court had unreasonably applied Supreme Court law to the record before it. *Michael Williams v. Taylor,* 529 U.S. 420 (2000). Nor did the Court indicate that evidence introduced at a properly conducted federal evidentiary hearing must be disregarded unless the federal court has already concluded that the state habeas court decision involved an unreasonable application of Supreme Court law. *See id.* at 437-44. The clear import of *Michael Williams* is, to the contrary, that any new evidence admissible either under § 2254(e)(2) or because the petitioner did not exhibit a lack of diligence in state court, is pertinent to the petitioner's claims under AEDPA.

Similarly, in *Holland*, a case governed by § 2254(d)(1), although the Court explained that a state habeas court's decision generally must be reviewed in light of the evidence presented at the state habeas proceeding, the Court immediately thereafter noted that a federal habeas petitioner can introduce new evidence if he "was not at fault in failing to develop that evidence in state court." 542 U.S. at 652-53 (citing *Michael Williams*, 529 U.S. at 431-37). As in *Michael Williams*, nowhere did the *Holland* Court indicate that such new evidence should be ignored absent an earlier determination of unreasonableness under § 2254(d)(1).[6] To the contrary, the Court first concluded that the new evidence presented by the petitioner during the federal habeas proceedings was not admissible under *Michael Williams* or § 2254(e)(2), and only then concluded that the state habeas court's decision was reasonable under § 2254(d)(1). *Holland*, 542 U.S. at 652-53.

*Bradshaw v. Richey* also suggests that the reasonableness of a state habeas court's decision under § 2254(d)(1) should be considered only *after* determining what evidence is admissible under *Michael Williams* and § 2254(e)(2). 546 U.S. 74, 79 (2005). *Bradshaw* faulted the Sixth Circuit for "relying on evidence that was not properly presented to the state habeas courts without first determining (1) whether respondent was at fault for failing to develop the factual basis for his claims in state court, or (2) whether respondent satisfied the criteria established by 28 U.S.C. § 2254(e)(2)." 546 U.S. at 79 (citing *Michael Williams*, 529 U.S. at 430-32). As in both *Michael Williams* and *Holland*, the *Bradshaw* Court nowhere indicated that the Sixth Circuit should have first considered the state habeas court's decision in light of the evidence produced in the state habeas proceeding, then considered whether the new evidence was admissible, and only then considered whether that new evidence warranted relief.

---

[6]In fact, the *Holland* Court specifically noted, without endorsing, the practice in certain circuits of reviewing claims based on such new evidence de novo because "there is no relevant state-court determination to which one could defer." *Id.* at 653.

Given AEDPA's statutory text and the Supreme Court's governing precedent, the most reasonable approach to any new evidence introduced in federal habeas proceedings is the most straightforward: Section 2254(e)(2) restricts the evidence that may be considered in federal habeas proceedings, and § 2254(d)(1) contains no additional restrictions on the relevant evidence. If the evidence is admissible under *Michael Williams* or § 2254(e)(2), and if it does not render the petitioner's claims unexhausted under *Vasquez*, then it is properly considered in evaluating whether the legal conclusion reached by the state habeas court was a reasonable application of Supreme Court law.

**[9]** Importantly, here, the district court expressly found that Pinholster had met the requirements for an evidentiary hearing under AEDPA. In the addendum to its order granting habeas relief on Pinholster's penalty phase ineffective assistance claim, the district court stated, in relevant part:

> Under . . . AEDPA, a petitioner is not entitled to an evidentiary hearing if he failed to develop the factual basis of a claim in state court. 28 U.S.C. § 2254(e)(2). "[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *[Michael] Williams v. Taylor*, 529 U.S. 420, 432 (2000). "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

> Pinholster sought an evidentiary hearing in state court regarding his claim that counsel was ineffec-

tive for failing to investigate and present mitigating evidence at the penalty phase. He did not fail to develop the factual basis of this claim in state court and an evidentiary hearing was appropriate.

**[10]** Based upon our independent inquiry, we cannot say that the district court erred in its analysis. *See Holland*, 542 U.S. at 653 (noting that in addition to the district court's failure to make the requisite findings for an evidentiary hearing, the Sixth Circuit also failed to "independently inquire into these matters"). Pinholster exercised diligence in pursuing an evidentiary hearing in state court regarding his mitigation ineffective assistance claim. By withdrawing its order to show cause and dismissing Pinholster's habeas petition on the merits, the state court denied Pinholster any further opportunity to develop the factual record in state court. Because Pinholster was diligent, the limitations of 28 U.S.C. § 2254(e)(2) are inapplicable. *See Holland*, 542 U.S. at 653.[7]

Moreover, even if those limitations did apply, we find that both the federal and the state habeas petitions detail many substantially identical facts, including trial counsel's failure to file a motion for a continuance to prepare a mitigation case for the penalty phase, counsel's introduction of Brashear's testimony, Pinholster's home life as a child, and Pinholster's

---

[7]The dissent suggests that Pinholster was not diligent in presenting evidence in state court because he did not present the diagnoses of specific doctors (Drs. Olson and Vinogradov) during his first habeas petition. Diss. at 16109. However, Pinholster *did* attempt to present mental health evidence in state court and was rejected. Pinholster's request for an evidentiary hearing in state court was denied. To claim that he was not diligent because he did not present mental health evidence in state court nullifies AEDPA's exception for diligence, and is simply illogical. The dissent also argues that Pinholster "hasn't shown he couldn't have returned to state court" to develop the record there. Diss. at 16111. Again, the genesis of this requirement is unclear. AEDPA requires only that the defendant diligently attempt to present the evidence in state court. § 2254(e)(2). Pinholster tried, but was denied that opportunity, and we know of no case law suggesting that he needed to be rejected twice.

educational, medical, social, psychological, and family background. Although Pinholster substituted experts during the proceedings who ultimately developed different mental impairment theories, these experts nonetheless relied on the same background facts that Pinholster presented to the state court. Accordingly, if § 2254(e)(2) were to limit the scope of the evidence before us, it would exclude only the new mental impairment theories introduced in federal court, and their exclusion would not affect our result.

[11] We therefore conclude that the mitigation evidence introduced at the federal evidentiary hearing is properly before us in considering Pinholster's penalty phase ineffective assistance claim. For the same reasons, and because the facts adduced at the evidentiary hearing have not fundamentally altered the penalty phase ineffective assistance claim that the California Supreme Court already considered, we also hold that Pinholster has properly exhausted this claim. *See Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999) (rejecting an exhaustion challenge as "unwarranted hairsplitting" where at each step of the habeas proceedings the legal claim remained the same, but the precise factual predicate changed after the evidentiary hearing).

## 2. Deficient Performance

[12] In *Strickland*, the Court held that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. *Strickland* also instructs that "[t]he proper measure of attorney performance [is] reasonableness under prevailing professional norms." *Id.* at 688. As one example of a "guide[ ] to determining what is reasonable," the Court referenced "[p]revailing norms of practice as reflected in American Bar Association standards." *Id.*;

*see also Rompilla*, 545 U.S. at 387 ("[W]e long have referred [to these ABA Standards] as guides to determining what is reasonable." (citation and internal quotation marks omitted) (alterations in original)).

At the time of Pinholster's trial in 1984, the ABA standards in place recognized that counsel in capital cases had a duty to investigate thoroughly the client's background and the circumstances of the case in an effort to uncover mitigating evidence relevant to the penalty phase defense:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

*Rompilla*, 545 U.S. at 387 (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)). This duty has been unequivocally recognized by the Supreme Court, which recently held that "[i]t is unquestioned that under the prevailing professional norms at the time of [Pinholster's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.' " *Porter*, No. 08-10537, slip op. at 9-10 (quoting *Terry Williams*, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, 4-55 (2d ed. 1980)); *see also Wiggins*, 539 U.S. at 524 ("'The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing . . . . Investigation is *essential* to fulfillment of these functions.' " (quoting 1 ABA Standards for

Criminal Justice 4-4.1, commentary, 4-55 (2d ed. 1982)) (emphasis added)).

**[13]** Since 1984—and in reliance on the same ABA Standards in place at the time of Pinholster's trial—the Court has elaborated that *Strickland*'s duty to investigate requires that counsel "present[ ] and explain[ ] the significance of all the available [mitigation] evidence." *Terry Williams*, 529 U.S. at 399. The Court has also found ineffective assistance where, "[d]espite these well-defined norms" articulated in the ABA Standards, "counsel abandoned their investigation of [the] petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524.

**[14]** The dissent labors to convince us that *Bobby v. Van Hook*, 558 U.S. ___, No. 09-144 (2009), somehow changed the rules with regard to the ABA standards. Diss. at 16116-20. However, the Court held that it is permissible to use a restatement of professional standards to help determine an attorney's obligation towards a client only when those standards "describe the professional norms prevailing when the representation took place." *Van Hook*, No. 09-144, slip op. at 4. That is precisely what we do here. We refer to the 1982 edition of the ABA standards that were in effect at the time of Pinholster's 1984 trial. Moreover, in *Van Hook*, the Sixth Circuit erroneously stated that attorneys "must fully comply" with the ABA guidelines. *Id.* (citing *Van Hook v. Anderson*, 560 F.3d 523, 526 (6th Cir. 2009)). Here we make clear, as the Supreme Court has, that such standards do not define reasonable representation, but rather are "guides to determining what is reasonable." *Strickland*, 466 U.S. at 688. The dissent's jeremiad is therefore misplaced.

In *Porter*, the Supreme Court found that the counsel's investigation "clearly did not satisfy" the aforementioned professional norms. No. 08-10537, slip op. at 10. Porter's counsel met with him only once to discuss the penalty phase and did

not obtain school, medical, or military records that counsel should have known would have led to significant mitigating evidence. *Id*. The Court also rejected counsel's excuse that Porter was "fatalistic and uncooperative." *Id*.[8]

**[15]** Similarly, the evidence here shows that Pinholster's trial counsel completely failed to discharge their responsibility to conduct the investigation required under *Strickland*. One week before the penalty hearing, counsel told the judge that they "did not prepare a case in mitigation" because they "felt there would be no penalty phase hearing." Notwithstanding counsel's admission, they inexplicably declined to request a continuance—even though the judge indicated he would readily grant one—because they did not believe the extra time "would make a great deal of difference." Billing records confirm counsel's own admissions that they spent almost no time preparing for the penalty phase hearing that would determine whether Pinholster would live or die.

At the penalty phase hearing, counsel waived their opening statement and presented only one witness, Pinholster's mother, Brashear, whose testimony the district court aptly described as "brief . . . damaging, incomplete, and inaccurate." Brashear testified about Pinholster's head injuries as a child as well as his epilepsy, but because the jurors lacked any accompanying expert testimony to explain the ramifications of those conditions they were left without the ability to make informed judgments about that evidence. Trial counsel also failed to obtain any of the readily available medical, psychological, law enforcement, or school records for Pinholster or his siblings. Consequently, when they asked their retained

---

[8]The dissent also uses this excuse, claiming that Pinholster was uncooperative in putting on a penalty-phase defense and claiming that he probably (and "rational[ly]") preferred to die than to spend his life in prison. Diss. at 16137-38. Pinholster said no such thing, and all evidence—including the habeas petition itself—speaks to the contrary. Regardless, a difficult or fatalistic client does not give counsel license to collapse into an armchair and admit defeat. *See Porter*, No. 08-10537, slip op. at 10-11.

psychiatrist, Dr. Stalberg—whom they hired only after the trial started—about the availability of mitigation evidence, they failed to provide him with materials that were necessary for him to make an informed determination.

The dissent disparages these damaging admissions. Rather than concede the lawyer's admissions, the dissent employs pop-linguistics to argue that what Brainard *really* meant when he said he did not recall conducting a reasonable investigation was that he actually did conduct a reasonable investigation. Diss. at 16131-33. The dissent also makes much the fact that the admissions were made after the trial, *id.* at 16132, 16144, but the Supreme Court's recent decision in *Porter* relied heavily on the counsel's post-conviction admission that he "had only one short meeting with Porter regarding the penalty phase . . . and that [h]e did not obtain any of Porter's school, medical, or military service records or interview any members of Porter's family." No. 08-10537, slip op. at 10. The Court clearly does not share the dissent's notion that post-conviction admissions by legal counsel do not count because attorneys are apt to lie. Diss. at 16132 n.10.

Here, counsel's performance was far more deficient than that of the attorneys in *Terry Williams*, *Wiggins*, and *Rompilla*, where in each case the Supreme Court upheld the petitioner's ineffective assistance claim. In *Terry Williams*, "[t]he record establishe[d] that counsel did not begin to prepare for th[e] [penalty] phase of the proceeding until a week before the trial," that counsel had called only a total of four witnesses, and that if counsel had not "failed to conduct an investigation[,] th[ey] would have uncovered extensive records graphically describing Williams' nightmarish childhood." 529 U.S. at 369, 395. In addition, in *Wiggins*, "[a]t no point did [counsel] proffer any evidence of petitioner's life history or family background," nor did counsel "expand their investigation beyond the PSI [Presentence Investigation Report] and the DSS [Department of Social Services] records." 539 U.S. at 516, 524. Finally, in *Rompilla*, counsel called five of Rompil-

la's family members as witnesses at the penalty phase and examined the reports of three mental health witnesses, but failed to review any of the materials in the court file on Rompilla's prior conviction, despite knowledge of the prosecution's intention to introduce those materials at trial. *See* 545 U.S. at 381-86.

Pinholster's trial counsel performed even less review of the readily available records than did the lawyer in *Wiggins*, who reviewed both the PSI report and the DSS records before the penalty phase. Moreover, similar to counsel in *Terry Williams*, Pinholster's attorneys spent less than a week preparing for the penalty phase, but in Pinholster's case, the preparation lasted less than an average workday. Also, while the lawyers in both *Terry Williams* and *Rompilla* performed deficiently even though they interviewed and called multiple witnesses at the penalty phase, Pinholster's counsel interviewed and pre sented just one witness, whose testimony was not only misleading, but also self-serving and harmful to Pinholster's defense.

Nor, as the district court properly found, were counsel's actions the result of any kind of reasonable strategic decision. Instead, counsel mistakenly thought that there would be no penalty phase at all, because the State had allegedly failed to provide notice of its intent to introduce aggravating evidence. As previously noted, however, the state trial court held a hearing on that issue and determined that the State had served Pinholster with adequate notice during the period in which he represented himself pre-trial. Nevertheless, even after learning of their mistake, counsel declined the court's invitation to move for a continuance to prepare for the penalty phase, stating on the record that they did not believe the extra time "would make a great deal of difference."[9] Such an uninformed

---

[9]Even assuming that the State had failed to provide adequate notice, counsel would not have been absolved of their duty to investigate and present mitigation evidence because the State could have relied solely on

decision cannot, by any reasonable stretch of the imagination, "be considered sound trial strategy." *See Strickland*, 466 U.S. at 689.

In exactly such an unreasonable stretch, our dissenting colleague demonstrates yet again why he would be such a talented writer of fiction. He concocts a fantastical trial strategy for Pinholster's attorneys despite their own admissions that they were simply unprepared. Counsel told the trial judge a week before the penalty hearing—much too soon for them to be "falling on their swords"—that they had not prepared a mitigation case.[10] Diss. at 16132 n.10. The truth of that claim was borne out a week later. To give attorneys the benefit of the doubt is one thing, but to fabricate an excuse that the attorneys themselves could not conjure up is another. The dissent suggests that counsel appeared *so* ineffective that they *must* have had something sinister in mind; in other words, *no one* could be *that* incompetent. However, given that counsel claimed to be unprepared for the penalty phase, rejected the offer of additional time to prepare, presented only one devastating "mitigation" witness, and secured their client a death sentence, it is obvious that they were not merely being sneaky; they were incompetent, and they failed miserably to

the evidence introduced at the guilt phase in seeking a death sentence, *see* CAL. PENAL CODE § 190.3. At a minimum, counsel had a duty to investigate Pinholster's background or to make a reasonable, informed decision that such an investigation was unnecessary. *See Strickland*, 466 U.S. at 691; *Terry Williams*, 529 U.S. at 396 ("trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background").

[10]Although Brainard failed to make up an excuse for his lack of preparation, the dissent gives him one, claiming that the attorney was employing the tactic of "falling on your sword" to help his client on habeas. Diss. at 16130-32, 16132 n.10. This flight of fancy goes too far—the Sixth Amendment guarantee of effective counsel, *see Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980), would be rendered meaningless if every attorney who is unable to explain his ineffective assistance is assumed to be effective because he is "falling on his sword."

discharge the duties they owed to their client at the penalty phase of his murder trial.

To be sure, in some cases counsel may have "sound reason to think it would have been pointless to spend time and money on . . . additional investigation," thereby rendering counsel's failure to discover additional mitigating evidence reasonable. *See Rompilla*, 545 U.S. at 383; *see also, e.g.*, *Burger*, 483 U.S. at 792-95 (finding "counsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances" reasonable where all potential witnesses brought to his attention provided information predominantly harmful to the defense). But such decisions are reasonable only because counsel made them *after* an investigation adequate enough to make an informed choice. *See Wiggins*, 539 U.S. at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."); *Duncan v. Ornoski*, 528 F.3d 1222, 1234 (9th Cir. 2008) (interpreting *Strickland* to mean that "decisions that are made before a complete investigation is conducted are reasonable only if the level of investigation was also reasonable"), *cert. denied*, 129 S. Ct. 1614 (2009); *Correll v. Ryan*, 539 F.3d 938, 948 (9th Cir. 2008) ("A decision by counsel not to present mitigating evidence cannot be excused as a strategic decision unless it is supported by reasonable investigations."); *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002) ("Although defense counsel is empowered to make such strategic decisions, *Strickland* demands that such decisions be reasonable and informed.").

**[16]** Here, defense counsel conducted no investigation into Pinholster's background *at all*, aside from interviewing his mother. Not only was counsel's investigation grossly inadequate; they also failed to look into any of the limited mitigating evidence that they *did* discover in their interview with Pinholster's mother, such as the evidence of Pinholster's epi-

lepsy. Since Pinholster's counsel did not even attempt a meaningful investigation, we can see no basis for concluding that they could have had any "sound reason" to believe that "*additional* investigation," *see Rompilla*, 545 U.S. at 383 (emphasis added), would not have, as they termed it, "ma[d]e a great deal of difference."

[17] Finally, the State's attempt to excuse counsel's failure to conduct the requisite investigation because Pinholster allegedly told them "not to put on a penalty defense" fails. As noted, this approach has been rejected by the Supreme Court. *See Porter*, No. 08-10537, slip op. at 10-11. Furthermore, in support of this assertion, the State relies on an interview report written by a defense investigator in July 1991. However, as the district court noted, because neither Pinholster nor the defense investigator testified at the evidentiary hearing, this statement is hearsay.[11] Regardless of its truth, the record demonstrates that the statement did not influence trial counsel's performance, because trial counsel *did* present a penalty defense, albeit a constitutionally defective one. Moreover, even assuming that the statement is true, it did not relieve counsel of their constitutional duty to investigate. "A defendant's insistence that counsel not call witnesses at the penalty phase does not eliminate counsel's duty to investigate mitigating evidence or to advise the defendant of the potential consequences of failing to introduce mitigating evidence, thereby assuring that the defendant's decision regarding such evidence is informed and knowing." *Williams v. Woodford*, 384 F.3d 567, 622 (9th Cir. 2004). Here, the State has failed to present any evidence that Pinholster was counseled concerning the possible repercussions of not introducing mitigation evidence, thereby enabling him to make any kind of informed, knowing decision on the matter. Counsel's admissions on the record instead reflect that they simply failed to prepare a miti-

---

[11]Although the State alleges that "[t]he parties had already stipulated to the admissibility of the report," the State provides no record evidence to that effect, nor can we find any.

gation case because they did not expect a penalty phase to occur, and then, out of apparent apathy or neglect of duty, declined a continuance without an informed or strategic basis for doing so.

[18] It is prima facie ineffective assistance for counsel to "abandon[ ] their investigation of [the] petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524-25; *see also Siripongs v. Calderon*, 35 F.3d 1308, 1316 (9th Cir. 1994) (holding that counsel performed deficiently by failing to "conduct more than a cursory investigation" and by making "no attempt to humanize [the defendant] before the jury"). Accordingly, we hold that counsel's almost complete failure to investigate the readily available mitigation evidence in Pinholster's case was objectively unreasonable under both the prevailing norms of practice, as reflected in the ABA Standards in place at the time of his trial, as well as the clearly established federal law in *Strickland*.

### 3.  Prejudice

We also hold that trial counsel's constitutionally deficient performance prejudiced Pinholster's defense. *See Strickland*, 466 U.S. at 687. As noted, to demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

[19] Regarding prejudice at capital sentencing, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. This inquiry requires us to "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. The

"totality of the available mitigation evidence" includes "both that adduced at trial, and the evidence adduced in the habeas proceeding[s]." *Terry Williams*, 529 U.S. at 397. More particularly, given California's requirement that a unanimous jury impose any death sentence, *see* CAL. PENAL CODE § 190.4(b), our inquiry is whether, based on the sum of this evidence, "*there is a reasonable probability that at least one juror would have struck a different balance*," *Wiggins*, 539 U.S. at 537 (emphasis added).

### a.  Aggravating Evidence

As the district court noted, there was substantial aggravating evidence in this case. The State presented evidence that Pinholster beat both of the murder victims, stabbed one of them with a knife, and took their wallets, all for a paltry gain of $23 and a quarter-ounce of marijuana. Yet, when Pinholster took the stand at trial, he denied murdering the victims and boasted that he had committed hundreds of robberies over the previous six years, using a gun, but never a knife, to victimize drug dealers. He was also openly disrespectful of the deputy prosecutor, appeared unconcerned with the seriousness of the underlying murders, and even laughed or smirked several times during the deputy prosecutor's cross-examination.

In addition, the State introduced evidence of Pinholster's earlier conviction for kidnapping with a knife, of his threat to kill the State's lead witness, and of his assault of another individual with a straight razor. Pinholster had a history of other violent outbursts as well, including striking a bailiff after a court proceeding, resisting arrest and assaulting several police officers, and once, during an apparent epileptic seizure, hitting his wife and breaking her jaw. The jury also heard evidence of Pinholster's juvenile gang activities and of his substantial disciplinary record at the Los Angeles County Central Jail, where his numerous infractions encompassed throwing urine at guards, threatening and assaulting guards, and initiating fights with other inmates. As a result of this

behavior, jail officials classified him as a disciplinary problem and gave him a low-calorie diet reserved for the most recalcitrant inmates.

### b.   Available Mitigation Evidence

**[20]** Although the State's aggravating evidence was severely detrimental to Pinholster's case, the record reflects that the harmful effect of that evidence could have been significantly mitigated had Pinholster's trial counsel performed competently. Instead, the only mitigation evidence introduced by defense counsel at the penalty phase was the inaccurate, damaging testimony of Pinholster's mother, Brashear. If counsel had conducted even a minimally adequate investigation, however, they would have found a trove of additional mitigation evidence that would have humanized Pinholster to the jury and, at the same time, contradicted Brashear's misleading version of events. This omitted, but readily available, evidence also would have done much to counter the State's aggravating evidence, which Brashear's testimony failed to rebut or even address.

### i.   Organic Brain Damage

**[21]** First, counsel would have discovered evidence of the organic basis for Pinholster's mental health troubles that developed as a result of his traumatic childhood head injuries. During the penalty phase, Brashear testified that when Pinholster was two, she injured his head "quite badly" when she accidentally ran over him with her car. The accident nearly tore off one of his ears. She also testified that, when he was four or five, she had a car accident in which his head went through the windshield. Pinholster's counsel, however, failed to present any medical evidence regarding the consequences of those injuries. As a result, the State argued to an uninformed jury that these injuries were insignificant:

> He was run over by a car when he was three years old. That's very unfortunate. There is no evidence of

any brain damage. A lot of children get dropped, fall
from their cribs or whatever. A couple of years later
he went through a car window, not hospitalized, got
medical care.

In addition, Brashear wrongly testified that Pinholster's
epilepsy began after a severe beating that he incurred in jail
at the age of eighteen. She then changed her story and claimed
that she discovered his epilepsy by witnessing the end of a
seizure, at which point he told her about his condition. Given
her confusing testimony, however, the State argued at the end
of the penalty phase that Pinholster did not have epilepsy at
all. The State also argued to the jury that if Pinholster truly
had epilepsy, "a doctor would have been brought in to tell you
that. Medical records, something." In contrast, readily avail-
able mitigation evidence would have shown that Pinholster's
childhood injuries likely had long-term effects on his mental
health.

[22] The evidence demonstrates beyond a doubt that Pin-
holster suffered from epilepsy from a young age. Pinholster
was first diagnosed with epilepsy and treated with anti-seizure
medication when he was only nine years old, and he fre-
quently suffered complex partial and grand mal seizures
thereafter. Dr. Olson concluded that the two car accidents
damaged the frontal lobes of Pinholster's brain, an injury that
frequently causes impulsive behaviors. This damage, Dr.
Olson explained, was evidenced both by Pinholster's epilepsy
and by his abnormal EEG reading as a child.[12] Dr. Vinogradov
similarly concluded that Pinholster's childhood head injuries
resulted in organic, pre-frontal brain damage that changed his

---

[12]The dissent spends some time arguing that Pinholster's epilepsy is
irrelevant because he was not suffering a fit when he committed the
crimes. The point, however, is that Pinholster's brain was so damaged by
his numerous head traumas that it caused epilepsy. In other words, epi-
lepsy is an indicator of pre-frontal brain damage, and pre-frontal brain
damage frequently leads to aggressive, impulsive behaviors. The jury did
not hear this evidence.

personality and explained his aggressive, violent, and antisocial behavior, while Dr. Stalberg characterized the injuries as possibly "devastating" and likewise connected them to Pinholster's epilepsy.

**[23]** This additional medical evidence would have helped counter the State's aggravation case in three respects. First, evidence that Pinholster's brain damage may have influenced, or even caused, his behavior at the time of the crime may have led jurors to conclude that he was less morally culpable at the time of the offense, and at least one juror may have been inclined to refrain from voting in favor of a capital sentence. *See Wiggins*, 539 U.S. at 537 (holding that prejudice is established if "there is a reasonable probability that at least one juror would have struck a different balance" between life and death). Evidence of organic brain injury in other cases has led juries to consider whether because a defendant's "behavior was physically compelled . . . his moral culpability would have been reduced." *Caro v. Woodford*, 280 F.3d 1247, 1257-58 (9th Cir. 2002). For this reason, evidence of serious mental health problems, including organic brain damage, is "precisely the type of evidence that we have found critical for a jury to consider when deciding whether to impose a death sentence." *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003). Here, as in *Porter*, it "was not reasonable to discount entirely the effect that [a psychiatrist's] testimony might have had on the jury or the sentencing judge." No. 08-10537, slip op. at 14.

Second, properly presented evidence of Pinholster's brain injury, and its profound effect on his behavior, could have altered the jury's impressions of his detrimental guilt phase testimony and of his boastful, disrespectful demeanor by indicating an organic basis for his inappropriate expressions and for his tendency to exaggerate his past. In this way, "in the hands of a competent attorney," the harmful evidence provided by Pinholster's trial testimony and by his offensive manner could actually "have been used to support [his] claims

of dysfunctional upbringing and continuing mental disorder." *See Correll*, 539 F.3d at 955.

**[24]** Third, evidence of Pinholster's organic brain injury would have humanized him in the eyes of the jury, even if the jury concluded that his brain injury was not responsible for his actions during his commission of the crime. It is not necessary that there be a direct causal connection between a defendant's brain injury and the crime he commits for the existence of that injury to serve as a humanizing and therefore mitigating factor during sentencing. *See, e.g.*, *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) ("Although it is true that [the evidence] would not relate specifically to petitioner's culpability for the crime he committed, there is no question but that such [evidence] would be mitigating in the sense that [it] might serve as a basis for a sentence less than death." (citations and quotation omitted)). The very existence of organic neurological problems may serve as mitigating evidence at sentencing by eliciting sympathy or, at the very least, some degree of understanding from the sentencer. *See Douglas*, 316 F.3d at 1090; *see also Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995) (holding that mental health evidence could be mitigating at the penalty phase "even though it is insufficient to establish a legal defense to conviction in the guilty phase"). Though the dissent mocks the fact that counsel did not attempt to humanize Pinholster, diss. at 16115-16, the Supreme Court clearly considers humanizing an important part of penalty-phase mitigation in a death penalty case. *See Porter*, No. 08-10537, slip op. at 12 ("The judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability.").

### ii.   Abusive and Deprived Childhood

**[25]** Second, if counsel had conducted an adequate investigation, they would have found evidence of Pinholster's abusive and deprived upbringing. Brashear minimized and

distorted the true nature of Pinholster's relationship with his step-father when she testified at the penalty phase:

Q: Did he get along with his stepfather, Mrs. Brashear? I am sorry, I know this is difficult for you.

A: Well, at times. He would try to discipline him and sometimes I was objectionable to that. Scott has always — he had a mind of his own.

. . .

Q: Do you feel that any of that punishment that was given to Scott was abusive or near abusive?

A: Well, I think so at times. Scott would push to the limit. He was a boy that — he had his own way. My husband sometimes would lose his temper with him, yes. He always thought he was punishing him to make him see that wasn't the thing he was supposed to be doing, and Scott rebelled even when he was quite young. We got in quite a bit of arguments and hassles.

Q: What kind of relationship does Scott have with his stepfather today?

A: Well, it's okay. He just feels very bad for what has happened to Scott.

Q: But is it a friendly relationship?

A: Yes.

[26] In stark contrast, the additional mitigation evidence showed that Pinholster suffered violent and continuous physical abuse during his early years. His brother, Terry, described this abuse as follows:

> [Our step-father] frequently beat Scott while Scott was a child; these beatings continued until Scott left our home. Bud would use his fists, a belt, or anything else available, including on at least one occasion a two by four board. Of all the children, Scott suffered the most frequent and violent beatings. The situation grew worse the older we got; it was not long before Scott received nothing positive at all from Bud. There was so much violence in our home I dreaded coming home each day.

Pinholster's half-sister, Tammy, likewise recalled:

> Scott as a child was frequently physically abused by Scott's step-father, Bud Brashear. Bud hit Scott with his fists as often as several times within one week. Bud's punishments were unpredictable and severe. For instance, Bud once was awakened early, and made all of us children run in circles in the back yard until we were near collapse. I have no recollection of Bud ever praising Scott or doing anything emotionally supportive for Scott.

Pinholster's psychiatric records also indicated that his step-father frequently used a paddle to hit him on the head, back, and shoulders, knocking him out at times without subsequent medical care. And relatives' additional declaration testimony showed that, beginning when Pinholster was one and a half years old, his maternal grandmother "beat the hell out of" him for resembling his biological father, whom she and her husband detested as a "good for nothing."[13] Absent this available

---

[13]The dissent minimizes this abuse, calling it "no more than spanking." Diss. at 16155. We think it safe to say that lifting a baby "up by his two hands with one hand, hold[ing] him up in the air, and wail[ing] on him with her other hand," "beat[ing] the hell out of him" and "while hitting him, yelling[ing] at [him] for being 'just like your father' " goes far, far beyond mere spanking.

mitigation evidence, however, the State was free to summarize Brashear's misleading testimony as ordinary discipline, arguing in its closing statement to the jury: "She said his stepfather disciplined him. So what? I am sure you have all disciplined your children. I was disciplined myself. I remember trying to run from my mother when I was 16 years old, and she couldn't catch me any more."

Brashear also testified that Pinholster "never really wanted for anything at home too much," having had "everything normally materialwise that most people have," and that although the family "didn't have lots of money," he always had "a roof over his head" and "decent clothes." She even recalled his supposed embarrassment at having friends over to the house because it showed the family's secure financial situation: "[T]he more impoverished people . . . that he hung around with, he wouldn't bring them up to the house. He said it was too nice a house and it ruined his image."

**[27]** As the available mitigation evidence would have shown, however, the truth was that Pinholster and his siblings suffered extreme deprivation. According to additional declaration testimony from Brashear's siblings, the family "remained extremely poor" after Brashear's second marriage, and "[t]he kids did not get enough to eat." Once, Brashear's sister stayed over and awoke in the middle of the night to see "the boys in the kitchen mixing flour with water, trying to make themselves something to eat. . . . The house was really filthy. . . . Completely unsupervised," the children "ran wild and trashed wherever they were living. . . . They ruined apartments, furniture, everything," until the family would "skip out on the rent and move somewhere else," generally to another "bad neighborhood[ ] with lots of crime." All the while, "when it came to spending money, Burnice always spent it on herself first. . . . Although her kids looked like raga-muffins and their clothes were always old and dirty, Burnice was always dressed very nicely." Without this evidence before the jury, however, the State was able to argue that Pinholster

"came from a good home. You heard that he was not a deprived child. Had many things going for him, probably more than many children."

### iii.   Family's Criminal and Mental History

**[28]** Third, with an adequate investigation, Pinholster's trial counsel would have discovered a wealth of evidence regarding his family's significant criminal and mental history. In her testimony, Brashear inaccurately distinguished Pinholster from the rest of his siblings, portraying him as the most wayward of her children by far. She testified that his siblings had been in "small trouble" with the law, and that they were "basically very good children":

Q: What kind of trouble?

A: My younger son once was picked up on a drunk driving, driving under the influence, which was dropped. I guess he wasn't really as intoxicated as they thought he was. The other was possession of some kind of drug. He got probation and was totally scared, not something you carry around in your car.

Q: How about your daughter?

A: She's been in a little bit of trouble, yes. Mostly self-destructive to herself. She was a wild girl. She isn't any more. She got picked up on a drunk arrest also.

When asked, "Generally speaking, was Scott like your other children?," she answered, "No, sir."

The available mitigation evidence would have established, however, that each of Brashear's children had severe problems. When Pinholster's older brother, Alvin, was twenty years old, the State charged him with the rape and sodomy of

a fourteen-year-old. He later entered a state mental hospital, where doctors diagnosed him with schizophrenia and determined that he was incompetent to stand trial. After several unsuccessful attempts, Alvin ultimately committed suicide by overdosing on drugs. Pinholster's younger brother, Terry, was diagnosed with mild depression and used drugs, and his half-sister, Tammy, first began drinking when she was eleven. At age seventeen, Tammy was charged with sexual battery and oral copulation on a fourteen-year-old girl. Tammy also had arrests for prostitution, public drunkenness, and possession of marijuana. Guy, a half-brother, who was diagnosed with manic depression and prescribed lithium, was admitted to two different psychiatric hospitals. Gary, another half-brother, had a history of alcoholism and a horrible temper.[14]

### iv. Pinholster's Substance Abuse

[29] Fourth, had trial counsel conducted an adequate investigation, they would have discovered evidence of Pinholster's longstanding substance abuse. At the penalty phase, Brashear testified that Pinholster grew up supported by his family, as a member of "a family that sticks close together like you would not believe," and made no mention of his chronic drug problems. According to the additional mitigation evidence, however, the reality was that Pinholster started sniffing glue and paint and using alcohol, nicotine, and marijuana between ages ten and twelve; using secanol, or downers, between ages thirteen and fourteen; and regularly using heroin and sporadically using cocaine between ages fourteen and sixteen. This substance abuse continued into his adulthood.

---

[14]According to relatives' additional declaration testimony, Pinholster's biological father also "did nothing but drink and party," had fits of anger and mood swings, and "sometimes would stay up all night pacing the house, yelling and screaming." After undergoing a mental-health evaluation for a custody hearing, he received a diagnosis as paranoid with narcissistic personality disorder.

### v. State's Exploitation of Brashear's Testimony

Finally, without any of the additional mitigation evidence, the State was able to capitalize on the weakness of Brashear's testimony in its closing argument:

> What did the defendant proffer in this particular case as to ask you to come back with anything less than death? Not one person, ladies and gentleman, came into this courtroom, not one person, to tell you about anything nice this man has ever done. About anything good in his background, about anything positive that you could consider as being something, maybe there is something salvageable. Not one person except his mother. A mother clearly loves her son, ladies and gentleman. Clearly not the most unbiased witness in the world.

The State argued that the defense offered "[n]othing except a mother who loves her son. Even the most heinous person born, even Adolph Hitler probably had a mother who loved him," and that "[i]t would probably be charitable to refer to [Pinholster] as a member of the human species." Given the absence of a minimally adequate defense investigation, these arguments went completely unchallenged, and Pinholster's counsel could only ask the jurors to be merciful, without providing any reason for them to do so. *See Rompilla*, 545 U.S. at 393 ("This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury . . . .").

[30] Based on the vast differences between Brashear's testimony and the evidence presented at Pinholster's habeas proceedings—as well as on the mitigating effect the additional evidence would have had on the State's aggravation case—we conclude that it was objectively unreasonable for the California Supreme Court to determine summarily that not one of the twelve jurors would have voted against the death

penalty. *Wiggins*, 539 U.S. at 537. We therefore find that counsel's deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687. We find this determination buttressed by the fact that, despite the brevity of defense counsel's penalty phase presentation, the jury deliberated for at least two and a half days before finally returning a death verdict.

Even more important, we find that application of the controlling precedent in *Porter, Terry Williams*, *Wiggins*, and *Rompilla*—as those cases inform the meaning of *Strickland*—admits of no other reasonable conclusion.

In *Porter*, the Court found that counsel had incompetently failed to present evidence of Porter's abusive childhood, alcohol abuse, military service, and brain damage. Porter's father beat his children and wife and, like Pinholster, Porter was his father's "favorite target." *Porter*, No. 08-10537, slip op. at 4. Also like Pinholster, Porter had trouble in school and attended special classes for slow learners. *Id.* Porter joined the military to escape his family life and was honored for fighting in two horrific battles. *Id.* at 4-5. Upon his return he developed a severe drinking problem and was diagnosed with "brain damage that could manifest in impulsive, violent behavior." *Id.* at 6.

In *Terry Williams*, had counsel conducted an adequate investigation, they would have discovered additional mitigation evidence that "Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings," that "Williams had been severely and repeatedly beaten by his father," and that Williams "had been committed to the custody of the social services bureau for two years." 529 U.S. at 395. Williams' counsel also would have found that he "was borderline mentally retarded and did not advance beyond sixth grade," that he had "help[ed] to crack a prison drug ring," and that he was a peaceful inmate. 529 U.S. at 396 (internal quotation marks omitted). The aggravating evidence, meanwhile, was

that before the murder for which Williams received the death penalty, he had been convicted of burglary, armed robbery, and grand larceny, and that after the murder, he had committed "two auto thefts and two separate violent assaults on elderly victims" and "had also been convicted of arson for setting fire in the jail while awaiting trial." *Id.* at 368.

In *Wiggins*, the available mitigation evidence that competent counsel could have presented was that "Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother," that "[h]e suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," and that he spent a period of time homeless. 539 U.S. at 535. In addition, Wiggins had "diminished mental capacities." *Id.* The only aggravating evidence, by contrast, was that he drowned his elderly victim in a bathtub and ransacked her apartment; he "d[id] not have a record of violent conduct that could have been introduced." *Id.* at 514, 537.

**Volume 2 of 3**

Finally, in *Rompilla*, the additional mitigation evidence was that Rompilla "was reared in [a] slum," that his "parents were both severe alcoholics," and that he "was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks." 545 U.S. at 390-92 (internal quotation marks omitted). This evidence also showed that Rompilla received "no expressions of parental love, affection or approval," that he and his siblings "were not given clothes and attended school in rags," that he drank too much alcohol, that he "suffer[ed] from organic brain damage," and that his "IQ was in the mentally retarded range." *Id.* at 392-93 (internal quotation marks omitted). The aggravating evidence, on the other hand, was that Rompilla had prior convictions for burglary, rape, and theft, and that "the murder was committed by torture." *Id.* at 378, 399; *Rompilla v. Horn*, 355 F.3d 233, 237 (3d Cir. 2004), *rev'd by* 545 U.S. 374.

Here, the facts are remarkably similar. Like Porter, Williams, Wiggins, and Rompilla, who were all severely beaten by their parents, Pinholster suffered vicious and repeated physical abuse from both his step-father and his maternal grandmother. All five men grew up deprived in extremely poor households, lacking any meaningful parental guidance or emotional support, and four of them spent parts of their childhood in various foster homes and other institutional environments. While Pinholster, Porter, and Rompilla incurred organic brain damage as children or young adults that impaired their mental health and influenced their behavior, Williams and Wiggins had mental capacities that bordered on or amounted to mental retardation. And Pinholster, Porter, and Rompilla suffered from addictions to alcohol from an early age.

Granted, the aggravating evidence in *Wiggins* and *Porter* was not as strong as that here. Wiggins, unlike Pinholster, lacked a record of violent behavior. Porter was a decorated veteran who returned home a changed man. But the State's aggravation case against Pinholster was not materially stronger than those in *Terry Williams* and *Rompilla*. While it is true that Pinholster boasted at trial about the many past robberies that he allegedly committed, as noted above, the available mitigation evidence of his brain damage and related mental problems could have influenced the jury's interpretation of that testimony by suggesting an organic origin for his violent, aggressive behavior and for his penchant for exaggeration. Moreover, unlike Pinholster's case, the aggravating evidence in *Terry Williams* included actual convictions for arson, burglary, armed robbery, and grand larceny; Williams' confession to two auto thefts and to two violent assaults on elderly victims, where one of the victims "was [left] in a vegetative state and not expected to recover"; and testimony from two experts that "there was a high probability that Williams would pose a serious continuing threat to society." 529 U.S. at 368-69 (internal quotation marks omitted). Rompilla likewise had actual convictions of theft, burglary, and—more serious than any of Pinholster's pre-murder crimes—rape, in which he slashed the victim with a knife. *Rompilla*, 545 U.S. at 378; 355 F.3d at 237. Of even greater importance, however, unlike Pinholster's case, the jury found that Rompilla "committed the murder by means of *torture*." 355 F.3d at 236 (emphasis added).

On the other hand, the facts in Pinholster's case are readily distinguishable from those in *Van Hook, Wong v. Belmontes,* and *Visciotti*. Nonetheless, we will discuss them in some detail here because they involved ineffective assistance of counsel and because *Van Hook* and *Belmontes* were decided while this case was pending. In *Van Hook*, the defendant's attorney put vastly more effort into preparing a mitigation case than did Pinhoster's. *Van Hook*, No. 09-144, slip op. at 8. For example, Van Hook's counsel presented eight mitiga-

tion witnesses—so many that the court found that additional "evidence from more distant relatives can reasonably be expected to be only cumulative." *Id*. Here, counsel presented one witness, and that witness's testimony was aptly described by the district court as "brief . . . damaging, incomplete, and inaccurate." Additional witnesses would not have been cumulative—indeed, they would have directly contradicted the one witness who had been put on the stand, and would have provided the only true mitigating evidence. Van Hook's attorneys also "looked into enlisting a mitigation specialist," *id*. at 6, presented information about Van Hook's exposure to domestic violence, drugs, and alcohol at a young age, *id*. at 7, and had experts testify that his mental health problems likely "impaired his ability to refrain from the [crime]" and caused his "explosion of senseless and bizarre brutality," *id*. (internal quotation marks omitted). This is precisely the type of evidence that was kept from Pinholster's jury. Despite the Chief Judge's best efforts to pose the dissent as a reflection of current Supreme Court jurisprudence, *Van Hook* has very little relevance to whether Pinholster's attorneys made reasonable efforts to represent him during the penalty phase of trial.

The recent decision in *Wong v. Belmontes* is also uninstructive in this case. At the outset, the Court was careful to limit the holding by stating that "[t]he challenge confronting Belmontes' lawyer . . . was very specific." 558 U.S. ___, No. 08-1263 (2009). Substantial evidence (including his own boastful admission) indicated that Belmontes had committed, and escaped punishment for, a previous murder. *Belmontes*, No. 08-1263, slip op. at 3. The prosecution was desperate to get that evidence in and Belmontes's attorney "built his mitigation strategy around the overriding need to exclude it." *Id*. He had to "proceed cautiously, structuring his mitigation arguments and witnesses to limit" the possibility that he would open the door. *Id*. at 4. Perched on this tightrope, the attorney still managed to "put on nine witnesses that he thought could advance a case for mitigation, without opening the door to the prior murder evidence." *Id*. at 5. If anything, Belmontes's

attorney's performance undermines the dissent's argument that Pinholster's one, ineffective mitigation witness was sufficient because his lawyers *may* have feared that other witnesses would have opened the door to some aggravating evidence. Diss. at 16166-69. Pinholster had not committed an additional murder just waiting to be revealed, and the record reveals no other such evidence. Nor did Pinholster's counsel assert that any such tactical reason existed for their failure to introduce the crucial mitigation evidence that they failed to uncover.

Belmontes's lawyer showed that putting on an effective mitigation case is possible even in the face of potentially devastating aggravating evidence. The mitigating evidence presented painted a complete picture of Belmontes's past, and the additional evidence that was not presented would have simply been cumulative: that his sister had died when he was young, that he exhibited signs of depression after her death, and that he had a strong, likeable, and respectful character. *Belmontes*, No. 08-1263, slip op. at 8. This evidence starkly contrasts with the unheard evidence in Pinholster's case: organic brain damage, mental disease, childhood beatings, abandonment, and a nuclear family filled with mental illness and violence. Not only did Pinholster's mother, the one mitigating witness, fail to paint an adequate picture, she downplayed and undermined his story in order to make herself look better on the stand.

Finally, in *Visciotti*, the aggravating evidence was substantially stronger, as Visciotti committed "a cold-blooded execution-style killing of one victim and attempted execution-style killing of another," both after Visciotti and his accomplice had driven the victims to a remote area to rob them. 537 U.S. at 20, 26. Visciotti's prior offenses, which included the "stabbing of a pregnant woman as she lay in bed trying to protect her unborn baby," were shockingly depraved. *Id.* at 26. At the same time, the mitigation evidence in *Visciotti* was significantly weaker than that in Pinholster's case, as Visciotti's

"troubled family background" lacked any physical abuse or privation comparable to that suffered by Pinholster as a child. *See id.* (internal quotation marks omitted).

Accordingly, we hold that the California Supreme Court's "postcard" denial of Pinholster's penalty phase ineffective assistance claim constituted an objectively unreasonable application of the clearly established federal law in *Strickland*. Pinholster's attorneys performed even more deficiently than the lawyers in *Terry Williams*, *Wiggins*, and *Rompilla*; and the balance between the available mitigating evidence and the aggravating evidence, for purposes of showing prejudice, is materially indistinguishable from that in *Terry Williams* and *Rompilla*.

**[31]** We therefore affirm the district court's grant of habeas relief on Pinholster's penalty phase ineffective assistance claim, finding such relief warranted when properly considered under AEDPA's deferential standards. Given the law and the facts discussed above, we are fully persuaded that it was objectively unreasonable for the California Supreme Court to determine summarily that not one of the twelve jurors would have voted against a death sentence, *especially in light of the fact that the jury deliberated for almost two and a half days before finally returning a death verdict.*

In doing so, we in no way minimize the brutal nature of Pinholster's underlying crimes of conviction. As the district court acknowledged, the murders were "heinous." Nevertheless, *Terry Williams*, *Wiggins*, and *Rompilla* establish that a habeas petitioner's "excruciating life history," *Wiggins*, 539 U.S. at 537, or "nightmarish childhood," *Terry Williams*, 529 U.S. at 395, can provide mitigating evidence powerful enough to outweigh the imposition of the death penalty for even the most horrendous of crimes, and that we cannot lightly disregard a capital lawyer's inexcusable failure to find and introduce such evidence.

Our paramount concern is not whether "few death sentences are safe from federal judges," diss. at 16103, but rather that federal judges "acknowledge[ ] the uniqueness of the punishment of death [and] 'the corresponding . . . need for reliability in the determination that death is the appropriate punishment.' " *McCleskey v. Kemp*, 481 U.S. 279, 340 (1987) (Brennan, J., dissenting) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). The guarantees of the United States Constitution, as interpreted by the Supreme Court, apply to our most troubled and our most upstanding citizens alike, and our duty as Article III judges to fairly and impartially apply those guarantees to all citizens compels us to rule as we do today.

## IV.   CONCLUSION

**[32]** For the reasons explained above, we AFFIRM the district court's decision upholding Pinholster's conviction but granting habeas relief on his penalty phase ineffective assistance claim. The case is REMANDED for the district court to issue a writ vacating Pinholster's death sentence, unless within a reasonable time set by the court the State conducts a new penalty phase trial or imposes a lesser sentence consistent with applicable law.

**AFFIRMED and REMANDED.**

Chief Judge KOZINSKI, with whom Judges RYMER and KLEINFELD join, dissenting:

The California Supreme Court *twice* considered Pinholster's claim that his death sentence be set aside because his lawyers performed ineffectively, and twice rejected that claim on the merits. Under AEDPA, those determinations come to us encased in a double layer of deference: first, the substantial deference to which lawyers are entitled under *Strickland* in making judgments during the course of their representation; and, second, the deference to which the state court is entitled in determining whether the lawyers' performance was ineffective *and* prejudicial. The first layer of deference may be overcome only if counsel's performance was objectively unreasonable under prevailing norms at the time and place of trial. The second layer may be overcome only if the state supreme court's determination is contrary to or an unreasonable application of clearly established Supreme Court authority. Pinholster comes nowhere close to flipping this "doubly deferential" presumption. *Knowles* v. *Mirzayance*, 129 S. Ct. 1411, 1420 (2009).

The majority reaches the contrary conclusion through a series of mistakes that have, unfortunately, become far too common in our circuit. First, the majority relies on evidence never presented to the state courts and that we may therefore not consider in federal habeas proceedings governed by AEDPA. *Contra Williams* v. *Taylor* (*Michael Williams*), 529 U.S. 420, 437-40 (2000). Second, the majority applies retrospectively a standard for counsel's performance that bears no relationship to that prevailing in California at the time of Pinholster's trial in 1984. *Contra Bobby* v. *Van Hook*, ___ S. Ct. ___, No. 09-144, slip op. at 3-8 (2009) (per curiam). Third, and perhaps worst of all, the majority accords no deference to the California Supreme Court's superior expertise in determining what constitutes competent representation among the members of its bar and the likely consequences (or lack

thereof) of any deficient performance. *Contra Schriro* v. *Landrigan*, 550 U.S. 465, 473-74 (2007).

Few state court judgments can withstand even one such error, *see, e.g.*, *Jones* v. *Ryan*, ___ F.3d ___, 2009 WL 3152396 (9th Cir. Oct. 2, 2009); *Libberton* v. *Ryan*, ___ F.3d ___, 2009 WL 3152389 (9th Cir. Oct. 2, 2009); *Gilley* v. *Morrow*, 246 F. App'x 519 (9th Cir. 2007) (unpublished); *Stankewitz* v. *Woodford*, 365 F.3d 706 (9th Cir. 2004); *see also* cases cited pp. 16115-16, 16151-52 *infra*, but in combination they are deadly. I had hoped that our en banc court would sweep away these mistakes and bring our caselaw into conformity with AEDPA. Instead, the majority repeats and magnifies the errors in these prior cases so that they will be very difficult, probably impossible, for us to correct. This perpetuates a habeas regime where few death sentences are safe from federal judges who know ever so much better than those ignorant state judges and lawyers how capital trials ought to be conducted. Because I don't believe we are the ultimate font of wisdom on such matters, I must dissent.

## Background

Following his conviction and sentence, Pinholster (represented by two new lawyers) took a mandatory appeal to the California Supreme Court. In a painfully thorough opinion that takes up 62 pages of the Pacific Reporter, Justice Mosk, writing for a unanimous court, affirmed. *People* v. *Pinholster*, 824 P.2d 571 (Cal. 1992). One of the numerous issues addressed in that appeal was whether the state had given adequate notice of its intent to present aggravating evidence during the penalty phase. *Id.* at 618-20. The court was thus well aware of Pinholster's claims that his lawyers weren't given notice and failed to ask for a continuance when the trial court offered it. *Id.* at 620.

Leonard Tauman was appointed habeas counsel for Pinholster in February 1990, when the direct appeal was still being

briefed. We know that Tauman began his investigation long before the California Supreme Court affirmed the conviction in February 1992, because we have declarations in the record dating back to 1991. Yet Tauman did not file Pinholster's first state habeas petition until August 1993, more than three years after he was appointed. This petition relied on many of the witnesses that were eventually presented in the federal habeas petition, and raised many of the facts the majority now says Pinholster's counsel should have discovered in preparing a mitigation case. The centerpiece of the petition was a report by a psychiatric expert, Dr. Woods, who diagnosed Pinholster as suffering from a mental disease, namely bipolar disorder, and a seizure disorder.

The California Supreme Court did not summarily brush aside this petition. Rather, it ordered that the state show cause why Pinholster ought not be granted relief "on the ground that petitioner received ineffective assistance of counsel [(IAC)] at the penalty phase of trial," in part because of counsel's failure "to ascertain that notice pursuant to Penal Code section 190.3 [of intent to provide aggravating evidence] had been provided and to move for a continuance." **[Ex. C-4]**\* The state responded at length, and Pinholster then filed a traverse. The California Supreme Court thus had extensive evidence and briefing on the central issue in our case and, as demonstrated by its show-cause order, must certainly have focused its attention on the IAC claim. Yet, after seeing it all, in July 1995 the court unanimously denied the petition "on the substantive ground that it is without merit." **[Ex. C-7]** A majority of the

---

\*Because the record is extensive, spanning multiple proceedings in different courts, I offer a legend for the cited sources. "ER" refers to the excerpts of record filed in this court; lettered exhibits, e.g., "Ex. B," are exhibits from the record of state habeas proceedings; numbered exhibits, e.g., "Ex. 40-1," are exhibits from the federal habeas proceeding; "DT" refers to the transcript of the evidentiary hearing in federal court; "TR" refers to the transcript of Pinholster's original trial in state court; and "CT" is the Clerk's transcript from the original trial in state court.

justices also denied various claims (not relevant here) on procedural grounds.

At that point, Tauman took a bow and exited stage left. The scene moved to federal court which, in April 1996, appointed Pinholster his second team of post-conviction lawyers, Michael Snedeker and Michael Abzug (the Michaels). A year later, the Michaels filed Pinholster's federal habeas petition, relying on a new mental health expert named Dr. Stalberg— a psychiatrist who just happened to be the same expert Pinholster's counsel had consulted at trial and who had found Pinholster to be sane and sober on the night of the crime. Dr. Woods, with his discredited theory that Pinholster suffers from bipolar disorder, was jettisoned, never to be seen again.[1]

Because Dr. Stalberg disavowed Dr. Woods' opinion (and vice versa), the parties recognized that the state court had to be given first crack at Dr. Stalberg's evidence. So, pursuant to stipulation, the federal petition was held in abeyance while, in August 1997, the Michaels filed a second habeas petition in the California Supreme Court. Its major difference from the first state petition was the omission of Dr. Woods and the inclusion of Dr. Stalberg, who said that he now saw lots of mitigating evidence that hadn't been brought to his attention when he was consulted at trial. Notably, Dr. Stalberg stopped well short of recanting his diagnosis that petitioner is a sane psychopath.

The state supreme court denied the second petition "on the substantive ground that it is without merit." **[Ex. B]** In addition, a substantial majority of the justices denied most of the claims on various procedural grounds (that they were untimely, successive or barred by res judicata). This is not

---

[1]The reasons for dropping Dr. Woods, who maintains a cottage specialty in diagnosing criminal defendants as psychotic, are obvious. None of the other experts to examine Pinholster on behalf of either side thought much of his diagnosis.

surprising, as the second state petition presented nothing new —not even a new psychiatric opinion purporting to absolve Pinholster of moral responsibility for the heinous acts he had committed.

The matter then went back to federal court where it was litigated for four more years, including cross-motions for summary judgment and preparations for an evidentiary hearing (generating over 110 docket entries), all on the assumption that Dr. Stalberg would opine that Pinholster was mentally impaired—which Dr. Stalberg would have figured out at trial if Pinholster's lawyers had only provided him with the information habeas counsel dug up. This plan backfired in July 2001 when the state deposed Dr. Stalberg, who testified that none of the new evidence changed his diagnosis that Pinholster does not suffer from a mitigating mental illness. Oops.

Two months later, the Michaels followed Tauman off-stage and the Federal Public Defender's office was substituted as Pinholster's third team of post-conviction lawyers. New counsel fired the radioactive Dr. Stalberg and found two new psychiatric experts (Drs. Olson and Vinogradov) who, in September 2002—18 years after the trial—came up with a diagnosis that Pinholster suffers from a mitigating mental illness: "organic personality syndrome" as a result of head trauma he sustained as a child.

All the while, the district court and the parties labored under the mistaken impression that Pinholster's case was not covered by AEDPA because he had filed his request for counsel and a stay of execution before AEDPA's effective date. *See Calderon* v. *U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 163 F.3d 530, 533, 540 (9th Cir. 1998) (en banc). The parties proceeded to an evidentiary hearing and the district court made findings while *Calderon* was still law of the circuit. This means that the district court did not limit petitioner to evidence that he first presented in state court, as required by AEDPA 28 U.S.C. § 2254(e); nor did the district court apply

AEDPA's standard of substantial deference to state court determinations of law and fact. *See, e.g.*, *Mirzayance*, 129 S. Ct. at 1420; *Landrigan*, 550 U.S. at 473-74; *Yarborough* v. *Gentry*, 540 U.S. 1, 11 (2003) (per curiam); *Woodford* v. *Visciotti*, 537 U.S. 19, 27 (2002) (per curiam).

As fate would have it, on the very day the district court issued its ruling, the Supreme Court cut the ground from under it by holding that AEDPA *does* apply to cases such as Pinholster's. *Woodford* v. *Garceau*, 538 U.S. 202, 206-07 (2003). Belatedly, the district court filed an order "finding" that petitioner had been diligent in developing the record in the state court, and that he was therefore entitled to present evidence in federal court that he had not presented in state court. The district court also erroneously held that it owed no deference to the state supreme court under AEDPA.

## Discussion

A claim that defense counsel in a criminal case was ineffective under *Strickland* calls for an inquiry into whether the lawyer's performance was worse than would have been rendered by minimally competent counsel practicing in the same community at the same time. The Supreme Court has repeatedly cautioned that we must step into that lawyer's shoes before attempting to judge his performance. We can't use hindsight or import standards from a different time and place. Even if we find that a lawyer was incompetent, we may not vacate the conviction unless it's clear that the defendant was actually prejudiced by the lawyer's performance; that is, unless we are convinced there is a reasonable probability that the outcome would have been different.

When AEDPA governs, we are constrained by yet another measure of deference, one that we owe to the state courts which first examined and ruled on the issue. Deference in the IAC context is particularly appropriate because the state courts, and state supreme courts in particular, are most famil-

iar with the type of inquiry we must undertake under *Strickland*. State court judges have an intimate familiarity with the local standards of practice and know far better than federal judges what could reasonably have been expected of competent counsel at the time and place of trial. State courts are also far more likely to understand the behavior of local juries, and thus can best figure out whether a hypothetical strategy, invented by habeas counsel years or decades after the trial, would have changed the outcome.

It is for such reasons AEDPA requires that we defer to the determinations of the state court unless they are *contrary to* or an *unreasonable application of* Supreme Court authority. 28 U.S.C. § 2254(d)(1). This extraordinarily high standard has teeth. *See, e.g.*, *Brown* v. *Payton*, 544 U.S. 133, 148-49 (2005) (Breyer, J., concurring) ("[T]his is a case in which Congress' instruction to defer to the reasonable conclusions of state-court judges makes a critical difference. Were I a California state judge, I would likely hold that [the] penalty-phase proceedings violated the Eighth Amendment. . . . Nonetheless, in circumstances like the present, a federal judge must leave in place a state-court decision . . . ." (citations omitted)). It is not merely a magic spell, the sing-song invocation of which can make the state court's decision disappear into thin air.

AEDPA limits federal courts in another important way: We may only consider evidence that was first presented to the state courts. 28 U.S.C. § 2254(e). This, too, makes perfect sense: Whether the state court has correctly—or reasonably— interpreted Supreme Court precedent depends on the facts. It makes no sense to say that a state court unreasonably applied clearly established Supreme Court law to facts it didn't know existed. The state court might well have ruled differently had petitioner presented different facts.

Through a pernicious combination of these errors, the majority runs roughshod over the perfectly reasonable deter-

mination, twice unanimously made by the state's supreme court, that Pinholster did not suffer prejudicial *Strickland* error. And it does so based on facts Pinholster never presented to the state court. This is nothing like deference.

## A. Our review is limited to the record presented in the state habeas petitions

According to the majority, 28 U.S.C. § 2254(e)(2), which requires development of the record in state court, is inapplicable because "Pinholster exercised diligence in pursuing an evidentiary hearing in state court regarding his mitigation ineffective assistance claim. By withdrawing its order to show cause and dismissing Pinholster's habeas petition on the merits, the state court denied Pinholster any further opportunity to develop the factual record in state court." Maj. op. at 16070.

The majority double-faults. First, Pinholster has not been diligent in presenting the diagnosis of Drs. Olson and Vinogradov—the two experts on whom he now relies—in his state habeas petitions. If Pinholster's trial counsel could have presented such expert opinions (or any expert opinion to the same effect) at the penalty phase, then Pinholster's habeas counsel could easily have presented such declarations in his first state habeas petition some 9 years after trial. And they certainly should have done so in his second state habeas petition, which was filed 13 years after trial.

Maybe the majority believes that was impossible because Drs. Vinogradov and Olson weren't available. But if not these particular doctors, there must have been *some* doctors who could have come up with the same diagnosis in 1993 or 1997 when Pinholster brought his state habeas petitions. If that was *not* possible, it would destroy Pinholster's claim that his trial counsel were ineffective by failing to come up with a Vinogradov and Olson-like diagnosis in 1984.

Pinholster is thus caught in a finger trap: He cannot claim trial counsel were incompetent in 1984 for failing to do that which diligent habeas counsel didn't do in 1993 or 1997. If competent trial counsel should have come up with this diagnosis at trial, then diligent habeas counsel should easily have come up with it in the state habeas petitions. But if diligent habeas counsel couldn't do it 9 years *after* trial, then trial counsel certainly couldn't have been incompetent in failing to do so *at* trial. The 18 year delay in presenting the diagnosis of "organic personality syndrome" must mean either that habeas counsel was not diligent or trial counsel was not ineffective. There's no escape.

The majority seems to think that *Michael Williams*, 529 U.S. at 430-32, *Bradshaw* v. *Richey*, 546 U.S. 73, 79 (2005), and *Holland* v. *Jackson*, 542 U.S. 649, 652-53 (2004) (per curiam), authorize Pinholster's habeas-by-sandbagging, but they don't. *Michael Williams* excused petitioner's failure to present evidence to the state courts only when "the factual basis of the claims was not reasonably available to petitioner's counsel during state habeas proceedings." *Id.* at 442. The claim in *Michael Williams* that could not have been presented to the state courts was based on information that only the prosecutor possessed, and petitioner's lawyers couldn't have discovered it until the case got to federal court. *Id.* at 440-43. By contrast, a different claim, one based on evidence that *was* available to petitioner while in state court—but which he failed to present there—was held precluded. *Id.* at 438-40.

In our case, nothing prevented Pinholster's counsel from presenting expert declarations with the same diagnosis as Drs. Olson and Vinogradov to the state supreme court. There was no problem with paying for such experts: Petitioner *did* present reports from two other psychiatrists, Drs. Wood and Stalberg, so his lawyers obviously had sufficient funding. *Compare Michael Williams*, 529 U.S. at 442 (state court denied funding for an investigator). Nor did the state hide anything from Pinholster; his own mental condition was hardly some-

thing the state could have concealed in any event. *Compare id.* at 441-42. Nor did Pinholster need the court's subpoena power to obtain the expert reports. *Compare id.* at 439-40. Nor can Pinholster claim that such expert opinions weren't available at the time of the state habeas petitions, because that would make them irrelevant for purposes of evaluating the trial lawyers' performance back in 1984. The reports of Drs. Olson and Vinogradov are just like the evidence in *Michael Williams* that the Supreme Court said couldn't be used because it was not first presented in state court.

*Holland* and *Bradshaw* help petitioner even less than *Michael Williams*. *Holland* states bluntly: "In this and related contexts we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it." 542 U.S. at 652 (citing *Yarborough*, 540 U.S. at 6, *Miller-El* v. *Cockrell*, 537 U.S. 322, 348 (2003), and *Bell* v. *Cone*, 535 U.S. 685, 697 n.4 (2002)). *Bradshaw*, like *Holland*, was another reversal of a court of appeals that had relied on extrinsic evidence without first determining whether the habeas petitioner had been diligent in developing it in state court. We could be next.

But there are two reasons the majority is wrong, not just one. The second is that petitioner hasn't shown he couldn't have returned to state court to present the Vinogradov and Olson evidence. He returned to state court once already after swapping out psychiatric experts. *See* pp. 16105-06 *supra*. The California Supreme Court may not have been thrilled to receive the second petition, but it did decide it on the merits and did not preclude further filings. Pinholster could have gone back—could still go back, so far as we know—to present the evidence from Drs. Vinogradov and Olson to the California Supreme Court. Our case is thus different from *Michael Williams*, where "state postconviction relief was no longer available at the time the [hidden] facts came to light, [and] it would have been futile for petitioner to return to the Virginia courts." 529 U.S. at 444.

Diligence under *Michael Williams* at least required Pinhol-
ster to try to go back to state court and present the expert
opinions of Drs. Vinogradov and Olson. By failing either to
present his newfangled theories to the state court or to show
that such an effort would have been futile, petitioner has
indulged in a double dose of non-diligence. Our consideration
of his new evidence is clearly barred by section 2254(e)(2).

This is the most dangerous part of the majority opinion as
it blots out a key component of AEDPA. The statute was
designed to force habeas petitioners to develop their factual
claims in state court. *See Michael Williams*, 529 U.S. at 436-
37. The majority now provides a handy-dandy road map for
circumventing this requirement: A petitioner can present a
weak case to the state court, confident that his showing won't
justify an evidentiary hearing. Later, in federal court, he can
substitute much stronger evidence and get a district judge to
consider it in the first instance, free of any adverse findings
the state court might have made. I don't believe that AEDPA
sanctions this bait-and-switch tactic, nor will it long endure.

The majority also says that none of this matters because
excluding the two expert reports "would not affect our result."
Maj. op. at 16071. If the majority means that, it should avoid
making such terrible law and reach its result without relying
on Pinholster's new psychiatric evidence. But I don't believe
the majority does mean it. The majority *must rely heavily on
the new experts, see, e.g.*, maj. op. at 16057, 16082-85,
because everything else Pinholster's lawyers managed to dig
up—after sifting through the rubble of his life for close to two
decades—is so piddling. It's hardly the stuff that would jus-
tify finding the state court unreasonable. *See* pp. 16148-62
*infra*. The proof is in the pudding: If the expert declarations
didn't matter, the majority would leave them out and avoid
making an obvious error under *Michael Williams*. That it
won't tells us something important.

**B.  The California Supreme Court did not twice unrea-
     sonably apply established Supreme Court precedent
     in concluding that Pinholster's trial counsel were
     competent**

*Strickland* v. *Washington*, which was decided shortly after
Pinholster's trial, had a number of important caveats that the
majority today seems to have forgotten:

> *No particular set of detailed rules for counsel's con-
> duct can satisfactorily take account of the variety of
> circumstances faced by defense counsel or the range
> of legitimate decisions regarding how best to repre-
> sent the criminal defendant.* Any such set of rules
> would interfere with the constitutionally protected
> independence of counsel and restrict the wide lati-
> tude counsel must have in making tactical decisions.
> . . .
>
> *Judicial scrutiny of counsel's performance must
> be highly deferential.* It is all too tempting for a
> defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy
> for a court, examining counsel's defense after it has
> proved unsuccessful, to conclude that a particular act
> or omission of counsel was unreasonable. *Cf. Engle*
> v. *Isaac*, 456 U.S. 107, 133-134 (1982). A fair
> assessment of attorney performance requires that
> every effort be made to eliminate the distorting
> effects of hindsight, to reconstruct the circumstances
> of counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective *at the time*.
> Because of the difficulties inherent in making the
> evaluation, a court must indulge a strong presump-
> tion that counsel's conduct falls within the wide
> range of reasonable professional assistance; that is,
> the defendant must overcome the presumption that,

under the circumstances, the challenged action "might be considered sound trial strategy." . . .

*The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense.*

466 U.S. 668, 688-90 (1984) (emphases added). More prophetic words have seldom been spoken.

The opinion here illustrates just how far we've strayed from the Court's wise cautions in *Strickland*. Rather than looking to the standards of practice applicable in the community at the time trial was held, we have now adopted a national standard embodied in the ABA Guidelines, which are read rigidly to require a certain kind of investigation and a certain kind of mitigation defense (what is known as "humanizing" the defendant) in every capital case. *Contra Strickland*, 466 U.S. at 689. No attention is paid to whether these standards reflect the contemporary norms in the community. Rather, current notions of a proper mitigation defense are telescoped back across the decades and retroactively imposed on counsel who had no way of knowing that this is what was expected of them. *Contra id.* This is exactly what the Supreme Court summarily reversed the Sixth Circuit for doing in *Van Hook*: "Judging counsel's conduct in the 1980s on the basis of [later ABA Guidelines]—without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial—was," the Court held, "error." *Van Hook*, No. 09-144, slip op. at 5. It's the same error the majority commits today.

Also contrary to *Strickland*, the majority pays hardly any attention to the facts and circumstances of this particular case,

or the reasons Pinholster's counsel may have had for proceeding as they did. *Strickland*'s twice-iterated caution that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *id.* at 690, is stitched into window dressing; the "strong presumption" is treated like the cantankerous relative who gets an occasional Christmas card but is never invited to dinner.

Perhaps most troubling is our total disregard of *Strickland*'s admonition that we not interfere with the independence of counsel and the latitude they must have in making tactical decisions. 466 U.S. at 688-89. The current infatuation with "humanizing" the defendant as the be-all and end-all of mitigation disregards the possibility that this may be the wrong tactic in some cases because experienced lawyers conclude that the jury simply won't buy it. Not all defendants are capable of rehabilitation, and not all juries are susceptible to such a plea. Counsel, who are in the courtroom and can observe the jurors and their reaction to various witnesses (including the defendant), may have good reason for pursuing other avenues of mitigation, such as sympathy for the defendant's family.

According to our case law, as amplified by today's opinion, any trial lawyer who fails to worship at the altar of "humanization," will be labeled an incompetent boob by later counsel and federal judges who all think they know how to represent the capital defendant better than his own trial lawyers. No self-respecting lawyer wants to be berated in a published opinion—as today's opinion does to Pinholster's trial counsel—so their self-interest will cause them to pursue the safe course for themselves rather than the course that best serves the client's interests. Current and future capital defendants will pay with *their* lives for preserving Pinholster's. *Cf. Van Hook*, No. 09-144, slip op. at 8.

The majority's methodology, which reflects the received wisdom in our court, has become an unstoppable engine for

setting aside death sentences. *See, e.g.*, *Hamilton* v. *Ayers*, ___ F.3d ___, 2009 WL 2973231, at *15 (9th Cir. Sept. 18, 2009) (requiring counsel to retain a mental health expert); *Belmontes* v. *Ayers*, 529 F.3d 834, 857-58 (9th Cir. 2008) (requiring counsel not merely to investigate mitigating mental health evidence, but to present it), *rev'd sub nom.*, *Wong* v. *Belmontes*, 558 U.S. ___, No. 08-1263 (2009) (per curiam); *Lambright* v. *Schriro*, 490 F.3d 1103, 1119 (9th Cir. 2007) (requiring counsel to "humanize" the defendant at sentencing). These cases, like the majority here, systematically fail to take *Strickland* seriously. That *Belmontes* was unanimously—and unceremoniously—reversed seems to have made no impression around here.

**1. The Standard of Care.** Petitioner has presented no evidence as to the standard of professional competence in capital cases that prevailed in Los Angeles in 1984. Rather, he relies on—and the majority accepts—the ABA Guidelines as the governing standard. The Supreme Court disagrees with this approach: "Restatements of professional standards . . . can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." *Van Hook*, No. 09-144, slip op. at 3. For the ABA Guidelines to be relevant, they "must reflect prevailing norms of practice and standard practice." *Id.* at 5 n.1 (internal quotation marks, alterations and citations omitted). Pinholster, who has the burden of proof, offers no evidence that the 1982 ABA Guidelines meet this standard for a capital trial in Los Angeles in 1984.

Moreover, at the time of Pinholster's trial, the ABA had no guidelines specifically applicable to capital cases (those didn't come about until 1989), and the guidelines pertaining to criminal cases were quite general. They certainly did not impose anything like the straightjacket the majority retroactively imposes on counsel today. The most relevant portion of the 1982 Guidelines consists of a single sentence buried in a paragraph of "Commentary." This sentence does no more than

point out that various aspects of the defendant's background "will be relevant" to an effective defense. That's a far cry from a commandment that lawyers leave no stone unturned when investigating the defendant's background. As the Court recently explained:

> The ABA standards in effect in 1985 described defense counsel's duty to investigate both the merits and mitigating circumstances in general terms . . . . Quite different are the ABA's 131-page "Guidelines" for capital defense counsel . . . . Those directives expanded what had been (in the 1980 Standards) a broad outline of defense counsel's duties in all criminal cases into detailed prescriptions for legal representation of capital defendants.

*Van Hook*, No. 09-144, slip op. at 4. The Court here was discussing the version of the guidelines in effect during Pinholster's trial, which occurred about a year before Van Hook's.

The Supreme Court, our court and the California Supreme Court have all held that competent counsel need not, and often will not, exhaust every avenue of investigation. *Strickland* itself held that counsel need not conduct an exhaustive investigation of a defendant's background. Instead, counsel only has "a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*." 466 U.S. at 691 (emphasis added). "[T]here comes a point at which evidence . . . can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Van Hook*, No. 09-144, slip op. at 8. At least in 1984, counsel was only required to "cover several broad categories of mitigating evidence," *id.*, something Pinholster's trial counsel did by any measure.

*Van Hook* is only the latest in a long line of similar cases. *Burger* v. *Kemp* noted that "[t]he record at the habeas corpus hearing does suggest that [counsel] could well have made a

more thorough investigation than he did," but the Court held he wasn't required to. 483 U.S. 776, 794 (1987). We follow a slightly stricter rule: "[C]ounsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence"—but even we acknowledge there is some limit on counsel's duty to investigate. *Babbitt* v. *Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (internal quotation marks omitted). The California Supreme Court is of the same mind. *See, e.g.*, *In re Ross*, 892 P.2d 1287, 1304-05 (Cal. 1995) (collecting cases).

Instead of rehashing the ABA Guidelines, the majority should be asking whether the investigation by Pinholster's counsel comported with the standards for counsel in a capital case in California in the mid-1980s. *Van Hook*, No. 09-144, slip op. at 5. The clearest evidence that it did comes from *Hendricks* v. *Calderon*, a capital case where we discussed the standard of care prevailing in California around the time of Pinholster's trial:

> Hendricks argues "that by 1981 [the time of trial] it was the recognized duty of defense counsel in capital cases to obtain social history evidence relevant to a client's mental condition where there was an indication of mental disturbance and to provide such evidence to an expert in order for the client's condition to be properly evaluated." *Under Hendricks' 1995 view, Berman was duty bound to interview Hendricks' family members and friends, to obtain medical, school, and employment records, to otherwise verify Hendricks' autobiography and pass this information on to his mental health experts.* "Without such background material," Hendricks continues, "the expert's diagnosis of the client's condition could not be meaningful." Hendricks' argument, then, is not that examination by two mental health experts was per se inadequate. Rather, Hendricks

argues that trial counsel had a duty to provide the experts with his client's family social history, even absent any request from the experts. He argues that counsel's failure to do so undermines the expert's conclusions to such an extent that they cannot provide an adequate basis on which the attorney could make strategic choices.

*Neither reason nor the existing authority would lead one to conclude that an attorney in 1980 had such an affirmative constitutional duty.*

70 F.3d 1032, 1038 (9th Cir. 1995) (emphasis added). The state relied on *Hendricks* as proof of the standard of care in its brief before us and in the district court.

Pinholster asks us to adopt a different standard of care based on the ABA Guidelines, but the *Hendricks* panel, writing in 1995—just about the time the California Supreme Court was ruling on Pinholster's state habeas petitions—specifically *rejected* Pinholster's interpretation of those guidelines:

Certainly, in 1981, Hendricks' attorneys did not believe they had any duty to investigate Hendricks' social history in the face of the unanimous opinions of their own experts that there was no basis for a mental defense.

The legal authority Hendricks cites offers meager support for his argument. Hendricks' cited authority merely discusses the basic duty under *Strickland* to investigate potential defenses before making strategic decisions. *See* ABA Standards Relating to the Administration of Criminal Justice, Standard 4-4.1; *U.S.* v. *DeCoster*, 487 F.2d 1197 (D.C. Cir. 1973); *Rummel* v. *Estelle*, 590 F.2d 103 (5th Cir. 1979). Hendricks' authority that touches upon the duty to

investigate mental defenses for the most part deals with an attorney's failure to investigate the possibility of a mental defense. *See People* v. *Frierson*, 25 Cal.3d 142, 162 (1979); *People* v. *Pope*, 23 Cal.3d 412, 428 (1979); *Deutscher* v. *Whitley*, 884 F.2d at 1160. At most, these cases establish a duty to seek out psychiatric evaluation of a client where the grounds of a mental defense are apparent, a duty Berman clearly discharged. Hendricks' cases make no comment on an attorney's alleged duty to investigate material relevant to a mental defense in the face of expert advice that there is no basis for such a defense. *See also Evans* v. *Lewis*, 855 F.2d 631, 637 (9th Cir. 1988) (failure to investigate defendant's mental condition when there is evidence of impairment constitutes deficient performance, and is prejudicial when it hampers later presentation of evidence of mental impairment).

*Hendricks*, 70 F.3d at 1039.

Since our own court, considering the very issue only 11 years after Pinholster's trial, said that no such duty existed in California at the time, how can we now—a quarter century removed from the trial and with no evidence on point—say that such a duty *did* exist after all? More, how can we say in 2009 that the California Supreme Court in the mid-1990s unreasonably applied established Supreme Court precedent by rejecting a standard of professional competence that we unanimously held *at the same time* did not apply to counsel in the 1980s?

The majority reaches its unjustified conclusion by misreading three oft-invoked and oft-misinterpreted Supreme Court cases: *Williams* v. *Taylor* (*Terry Williams*), 529 U.S. 362 (2000), *Wiggins* v. *Smith*, 539 U.S. 510 (2003), and *Rompilla* v. *Beard*, 545 U.S. 374 (2005). My colleagues seem to think that these opinions create a nationwide, retroactive code of

professional conduct for capital cases. (Never mind that *Strickland* says, and *Van Hook* confirms, there's no such thing.) The majority's exegesis on these cases is but one more in a series of inapt methodologies that this en banc court should have put to rest.

*Terry Williams* has little to say about the source or scope of the standard for professional competence in capital cases. While it cites the ABA Guidelines in passing, 529 U.S. at 396, there was no real dispute that counsel there had been ineffective. The same state trial judge who sentenced Williams concluded that counsel's performance was deficient, *id.* at 370, a conclusion the Virginia Supreme Court accepted and that the State "barely disputed" before the U.S. Supreme Court. *Id.* at 395. There was evidence, as there is not in this case, that counsel's performance did not comport with the standard of care in the community at the time and place of trial.

The only real dispute in *Terry Williams* was whether the state court had properly applied the prejudice prong of *Strickland*. The Virginia Supreme Court wrongly believed that *Lockhart* v. *Fretwell*, 506 U.S. 364 (1993), modified *Strickland*'s prejudice inquiry, and the U.S. Supreme Court set it straight. Insofar as the Supreme Court passed on the competency of counsel, it was to confirm the state court's judgment, not overrule it as unreasonable. *Terry Williams* has nothing to say about the standard under AEDPA when the state court finds the lawyer has been competent and the federal court disagrees.

*Wiggins* is hardly better for Pinholster. First, the trial judge there "observed from the bench that he could not remember a capital case in which counsel had not compiled a social history of the defendant, explaining, '[n]ot to do a social history, at least to see what you have got, to me is absolute error.' " *Wiggins*, 539 U.S. at 517. Thus, the *Wiggins* Court had a finding by a state judge who was experienced in local practices

that Wiggins' lawyer had performed incompetently. The Supreme Court expressly relied on this time- and place-specific determination: "As [the trial judge] acknowledged, standard practice in Maryland in capital cases at the time of Wiggins' trial included the preparation of a social history report." *Id.* at 524.

Second, insofar as the ABA Guidelines are relevant, Wiggins' trial took place after the ABA issued its 1989 Guidelines providing specific standards for capital cases, and it is *that* version of the ABA Guidelines on which the *Wiggins* Court relied. But the 1989 Guidelines are far more mandatory and specific than the 1982 Guidelines that were in force at the time of Pinholster's trial. Whereas the 1982 Guidelines contained only a single sentence in the "Commentary," pointing out certain types of inquiries that "will be relevant" in all criminal cases, the 1989 Guidelines outline capital counsel's affirmative duties at some length, including an investigation that " 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' " 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989)) (emphasis added by the Court). Although I doubt that *Wiggins* turned the ABA Guidelines into a constitutional code of conduct for lawyers, *see Van Hook*, No. 09-144, slip op. at 5 & n.1, even if I'm wrong, it's irrelevant; in *Wiggins* a newer, more exacting edition of the guidelines applied and those standards cannot be ported back to Pinholster's case.

Finally, there's *Rompilla*, which says nothing about the general scope of investigation required for defense counsel in capital cases. The *Rompilla* majority found a single flaw in defense counsel's performance, namely the failure to examine the case file of a prior conviction that counsel knew the prosecution would rely on in aggravation, 545 U.S. at 383, 387-90, a point emphasized in Justice O'Connor's linchpin concur-

rence. *Id.* at 393-94. And Justice O'Connor saw no need to cite the ABA Guidelines at all. *Rompilla*'s holding does not support the view, adopted by the majority here and by a number of other recent cases, that some version of the ABA Guidelines is the minimum standard of practice the Constitution imposes on all 50 States. I would be surprised to learn that the Supreme Court in *Rompilla* had meant to give the ABA the constitutional authority to set the standard of care for all criminal cases across the nation. And I wouldn't be alone. *See Van Hook*, No. 09-144, slip op. at 1 (Alito, J., concurring).

*Terry Williams*, *Wiggins* and *Rompilla* rely on the ABA Guidelines as background support where they overlap with local standards (*Terry Williams* and *Wiggins*) or where the proposition is so obvious that it's a matter of common sense (*Rompilla*). *See Van Hook*, No. 09-144, slip op. at 8. These cases don't establish the ABA as the final authority on how lawyers must conduct criminal trials, with the power to override contrary determinations by the state courts about the lawyers they admit to practice. And yet the majority relies entirely on the ABA Guidelines without any evidence that the Guidelines reflect local standards in the community at the time of Pinholster's trial. This is what the Sixth Circuit got summarily reversed for in *Van Hook*.

Here we have more than petitioner's failure of proof. We have evidence going the other way: a determination by our court in *Hendricks* and other cases, *see* pp. 16147 *infra*, that the duty to investigate at the time was *not* what petitioner now claims it to be. This is *Van Hook* on stilts.

**2. The Facts of This Case.** Justice O'Connor's concurrence in *Rompilla* emphasized "our longstanding case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." 545 U.S. at 394. The majority here does very little to determine what competent counsel could realistically have done to help Pin-

holster at the penalty phase. Not even lip service is paid to the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Rather, the majority is satisfied with pointing out that counsel were surprised by the need to put on mitigation evidence, that they turned down an offered continuance and that they "billed a total of only 6.5 hours in preparation for the penalty phase of the trial." Maj. op. at 16051 (footnote omitted). The majority is wrong on all counts.

I might as well start with the most obvious error. The "only 6.5 hours" has been brandished by petitioner's able habeas counsel like a smoking gun: concrete proof that Pinholster's trial lawyers must have been incompetent because they spent less than a work-day preparing for such an important hearing. Problem is, the "only 6.5 hours" is a myth.[2]

The 6.5 hour figure comes from the time records of Brainard, who was just one of Pinholster's trial lawyers, and includes only time that bore the notation "prep. for penalty phase." *See* Maj. op. at 16051 n.2. But the defense team clearly spent a lot more time on mitigation. Under California law, the prosecution didn't have to put on penalty-phase evidence at all in order to ask for the death penalty; it could have relied entirely on the evidence presented during the guilt phase. Thus, it doesn't matter whether the prosecution has given, or the defense has received, notice of an aggravation hearing. In preparing for trial, counsel in California must necessarily consider both guilt and penalty, and try to work as much mitigation evidence as possible into the guilt phase.

Pinholster's trial counsel did precisely this. They put on Pinholster's brother, Terry, to support his alibi defense, but also elicited from him the following mitigation evidence: (1)

---

[2]Building such mythology appears to be one of the tools of the trade for habeas counsel. *See Van Hook*, No. 09-144, slip op. at 6. There must be a CLE course by that name.

that Pinholster "was more or less in institutions all his life" **[TR 6015]**; (2) that Pinholster suffered from epilepsy and Terry had seen him have two seizures in a single evening **[TR 6015-18, 6031-32]**; and (3) that Pinholster was drunk on the night of the murders. **[TR 6036]**

Terry was examined at trial by Brainard, and Brainard must have prepped him or he couldn't have learned about those mitigating facts to begin with. Yet an examination of Brainard's time records makes no mention of speaking to Terry, and certainly doesn't say that this was time spent on mitigation.

It is possible that the prep work on Terry was done by Dettmar, Pinholster's other trial counsel, or that it was included in one of Brainard's more cryptic notations, such as "Interviewing defense witnesses" (3/28/84), "Brainard & Dettmar interview of witness" (3/6/84) or "Brainard & Dettmar interview with" (3/7/84). **[Ex. 71-2]** Or, perhaps Brainard was not diligent about time records. One way or the other, some of the time spent preparing Terry must be counted as time counsel spent on mitigation and the 6.5 hours, all of which were spent after Terry testified, obviously don't include that.

There are other hours logged on Brainard's time sheets that were clearly devoted to mitigation. For example, on February 23, 1984, he billed for "Conf. with Burnice Brashear, Pinholster's mother," and two days later for "Research re; epilepsy and conf. with nurse." **[Ex. 71-2]** There was nothing Burnice could have possibly said about the crime, so the time spent with her must have been entirely on mitigation. The time spent on epilepsy was also obviously mitigation-related. Brainard's time records show that he spent about 700 hours on Pinholster's case and much of that time is described in fairly general terms. Just because there were only 6.5 hours that he specifically described as preparation for the penalty phase doesn't mean that's all the time he spent on mitigation.

The majority claims that Pinholster's counsel admitted "that they spent almost no time preparing for the penalty phase hearing," maj. op. at 16074,[3] but I've found no such admission in this very hefty record. Nor is the majority right in claiming that "[b]illing records confirm" such an admission. The only time sheets and declarations they reference are Brainard's. Maj. op. at 16051 n.2, 16074. Yet, according to Brainard, it was Dettmar who was primarily in charge of the penalty phase. **[ER 182, 337, 350, SER 122]** We don't have a complete set of Dettmar's time records; we have only those through March 15, 1984, which does not include the 8-week period leading up to and including the penalty phase, when Dettmar most likely would have been preparing for that portion of the trial. What we do have of Dettmar's time sheets indicates that he spent considerable time preparing for mitigation.

Thus, on January 13, 1984, we have the notation "phone call to defendant's mother re medical history"; on February 21 there is "Penal Code research on capital punishment"; on February 23 there is "conference with defendant's mother re childhood problems"; on February 25 there is "Research on Pen. C. 190.3";[4] on February 29, there are notations for various mitigation-related items, including "Further research on Pen. C. 190.3" and "Phone call to appointed psychiatrist." On February 26, Dettmar spent six hours on "preparation argument, *death penalty phase*" (emphasis added).

There are other, more cryptic notations that might or might not go to mitigation, such as "Visit to client, L.A. County

---

[3]In the same paragraph, the majority states: "One week before the penalty hearing, counsel told the judge that they 'did not prepare a case in mitigation' because they 'felt there would be no penalty phase hearing.' " Maj. op. at 16074. These statements are not from the transcript of Pinholster's trial. What the majority is quoting are Brainard's self-inculpatory declarations, dozens of which he dutifully signed seven years after the trial. *See* pp. 16130-32 & nn.6-9 *infra*.

[4]Penal Code § 190.3 deals with mitigation in capital cases.

Jail" (February 10), but such as we have of Dettmar's time sheets shows that the defense team was keenly aware of the need to show mitigation and was vigorously investigating mitigation evidence. Dettmar's time records stop abruptly on March 15, 1984, which was in the midst of the guilt phase, so we don't know what else he did to prepare for the "death penalty phase," but we do know he was active because he made further court appearances and his name is referenced in Brainard's time sheets.

For all we know, Dettmar did just about everything Pinholster claims should have been done on his behalf, like examining his medical and school records, talking to school authorities, prison guards, friends and neighbors, all in a vain effort to find someone who would say a good word about him. We know that Dettmar was the contact point for Dr. Stalberg, the defense team's psychiatrist, and that Dettmar provided him with the information the doctor used in forming his diagnosis. (Dr. Stalberg's opinion letter is addressed to Dettmar, and Dr. Stalberg mentions in his declaration that his dealings were with Dettmar.) This activity clearly went to mitigation, yet (except for a phone call on February 29) the time spent is not accounted for on any time-sheet Pinholster has supplied. There is no lawyer's case file documenting the activity, and there's no testimony about it; we know virtually nothing about it. Dettmar's activities in the two months leading up to and including the penalty phase are a complete blank. There may be mitigation-related activities about which we know nothing at all.

Which brings us back to the burden of proof, which rests on petitioner, and the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Pinholster fails to shoulder his heavy burden of overcoming that presumption. Inasmuch as Pinholster has been unwilling or unable to document the actions of half his trial team during a crucial two months in the proceedings, he has failed to carry the ordinary

burden of any habeas petitioner. And he certainly comes nowhere near carrying the especially heavy burden in ineffectiveness cases, where he must overcome the "strong presumption" that counsel were diligent and competent in advancing his interests.

We know, based on the documentation we do have, that the lawyers engaged in activities that were highly relevant to mitigation, such as retaining a psychiatrist who examined Pinholster, talking to the defendant's mother and brother and educating themselves about epilepsy. We also know from Dettmar's time sheets that he was preparing for the "death penalty phase" as early as February. *See* 16126 *supra*. It therefore isn't remotely consistent with the record and the "strong presumption" to say, as the majority does, that Pinholster's trial team spent "less than an average workday" preparing for the penalty phase. Maj. op. at 16076.

Petitioner bears the burden of proof, so if he wants to claim that his lawyers didn't spend enough time on mitigation, he must account for all the time they did spend before we can say they didn't spend enough. It's not fair—or consistent with AEDPA—for petitioner to present partial time records for the first time in federal court, pp. 16126 *supra*; p. 16130 n.6 *infra*, and then claim—Tada!—my lawyers only spent 6.5 hours on mitigation. This gambit didn't work in *Van Hook*, No. 09-144, slip op. at 6, and it shouldn't work here.

In addition to the supposedly short time Pinholster's defense team spent on mitigation, the majority's other "proof" that his lawyers must have been incompetent is the fact that they were taken by surprise at the end of trial when they learned there would be a penalty phase and yet refused a continuance offered to them by the trial court.[5] The decision to

---

[5]I'll assume, like the majority, that the lawyers were in fact surprised that the state planned to put on aggravation evidence at the penalty phase, but the record can also be construed otherwise. As noted, Dettmar's time

decline a continuance only seems incompetent if the defense lawyers hadn't already conducted an adequate investigation into mitigation. But if they had been looking for mitigation evidence all along, they would already have decided what mitigation strategy to pursue. And if their decision was to present only Pinholster's mother in mitigation, then turning down a continuance was perfectly reasonable; "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

The record is clear that the defense team was quite busy preparing mitigation evidence, and specifically preparing for the capital penalty phase, long before the jury came back with a guilty verdict. We know that they consulted a psychiatrist, but only after the trial started, suggesting that his testimony wasn't intended for guilt-phase issues (which involved an alibi defense), but for mitigation. They talked to the mother

---

records show him billing for the "death penalty phase" as far back as February. Brainard too has a notation in his time records, "Start prep. for penalty phase" on April 11, two weeks before the defense team was supposedly surprised that the prosecution planned to put on aggravation evidence. Maj. op. at 16051 n.2. If the defense lawyers truly had no idea there would be a penalty phase, why were both of them billing time as preparing for it?

The defense team did claim in court they weren't aware of the state's notice, but how else were they going to have a shot at precluding the state from putting on an aggravation case? Claiming that they had actual notice, but the notice was somehow defective because it had been sent directly to Pinholster, certainly wasn't going to be persuasive. So the defense claimed they hadn't seen the notice—which may have been literally true. But what was certainly not true for two experienced criminal lawyers in California is that they expected the prosecution wouldn't try to put on aggravation witnesses in a capital murder case. Being experienced, the lawyers must certainly have known that if the jury came back with guilty, the prosecution would have witnesses lined up to support their demand for the death penalty. So they may have done their best to stop them by telling the judge they didn't know it was coming.

about his emotional problems and medical history, and they educated themselves on epilepsy, all matters not relevant to the alibi defense. Pinholster's lawyers clearly investigated the "several broad categories of mitigating evidence" they should have considered. *Van Hook*, No. 09-144, slip op. at 8. They were required to do no more than that.

For all we know, this is just the tip of the iceberg of what the defense team did in pursuing mitigation evidence since Dettmar's time records for the crucial period from March 15 until the end of trial are missing. Dettmar's case file is also missing, which could have given us pretty good insight into the activities of Pinholster's "death penalty phase" lawyer as the defense team was in full swing preparing for the penalty phase. Dettmar was dead by the time of the first habeas petition, so we have no statements from him, but his case file would almost certainly still have been in existence at the time Pinholster's first habeas lawyer commenced his investigations. Yet there is no explanation for why the case file wasn't retrieved and presented in the state habeas petition. Most likely it's because Pinholster's first two habeas teams didn't pursue this line of inquiry; even Brainard's time records were never presented to the state courts.[6]

In the absence of any evidence as to what the defense team, and particularly Dettmar, actually did in investigating mitigation evidence, the majority relies on a series of non-denial denials[7] from Pinholster's surviving counsel, Brainard. Maj. op. at

_____

[6]Which means we shouldn't be considering the time records at all because Pinholster was not diligent in presenting them to the state courts. *See* pp. 16109-12 *supra*. Nor did he raise the "only 6.5 hours" argument in his state petitions. Had he done so, I doubt the state judges would have been gulled by the bogus "only 6.5 hours" figure.

[7] Non-denial denial is a phrase that became popular in the wake of the Watergate scandal, referring to an equivocal denial, particularly one made by an official to the press. London's *The Sunday Times* has defined it as "an on-the-record statement, usually

16051-52. These statements, stamped out by the dozen at the behest of habeas counsel 7 years after the trial, seem to say a great deal but, in fact, say nothing at all. Thus, Brainard had "no recollection" that Dettmar had reviewed any medical or school records; he did "not recall" interviewing or attempting to interview family members or any other persons regarding penalty phase testimony; he had "no recollection of seeing or attempting to secure Scott's school records." Within a single paragraph the majority quotes Brainard as not recollecting or having no recollection or stating "so far as [he] recollect[ed]" no fewer than 5 times. Maj. op. at 16051-52 (second alteration in original).[8] There is not a single categorical statement attesting that Brainard and Dettmar failed to do any of these things.

Failure to recall can be very useful because it avoids the risk of contradiction or perjury. Who, after all, can dispute that someone else doesn't recall something? But when evidence is needed to carry the burden of proof, a lack of recollection is worth absolutely nothing. Indeed, a failure to recall does not even satisfy the burden of production, because it does not prove or disprove the fact not recalled.[9] Brainard's

---

made by a politician, repudiating a journalist's story, but in such a way as to leave open the possibility that it is actually true."

A "non-denial denial" is a statement that seems direct, clearcut and unambiguous at first hearing, but when carefully parsed is revealed not to be a denial at all, and is thus not untruthful. It is a case in which words that are literally true are used to convey a false impression; analysis of whether or when such behavior constitutes lying is a long-standing issue in ethics.

Wikipedia, *Non-denial denial*, http://en.wikipedia.org/wiki/Non-denial_denial (last visited November 22, 2009).

[8]The majority doesn't quote it, but Brainard also did not recall why he failed to ask for a continuance when the trial court offered it. **[ER 367]**

[9]The majority is right that Brainard's failure to recall also doesn't prove he *did* perform a reasonable investigation, maj. op. at 16075, but it doesn't matter because the state need not prove that counsel performed a reason-

accommodating statements, no doubt made to try to help a former client, prove zilch. *See also* p. 16128-29 n.5 *supra*.[10]

If we assume, as the majority plainly does, that Pinholster's trial lawyers couldn't walk and chew gum at the same time, then no degree of idiocy on their part would surprise us. But we must indulge in the contrary "strong presumption that [they made choices] for tactical reasons rather than through sheer neglect." *Yarborough*, 540 U.S. at 8 (citing *Strickland*, 466 U.S. at 690). What this means for us is that we must presume, consistent with the time records we do have, that Pinholster's trial lawyers were fully aware that they would have to deal with mitigation sometime during the course of the trial, did spend considerable time and effort investigating avenues for mitigation and made a reasoned professional judgment that the best way to serve their client would be to rely on the fact that they never got notice and hope the judge would bar the state from putting on their aggravation witnesses. Nevertheless, the time sheets show that both lawyers were busy preparing for the penalty phase long before they

---

able investigation. It is petitioner who must prove the opposite. Porter met this burden through the affirmative statements of his only trial counsel. *Porter* v. *Crosby*, 2007 WL 1747316, at *2, 25 (M.D. Fla. 2007). Pinholster has no evidence at all from one of his lawyers and the other one doesn't remember.

[10]Brainard's forgetfulness is just another example of counsel "falling on his sword," something trial counsel are known to do to help their clients on habeas. *See, e.g.*, *LaGrand* v. *Stewart*, 133 F.3d 1253, 1276 (9th Cir. 1998); *Hendricks*, 70 F.3d at 1039. Because counsel usually suffer few if any consequences for being found ineffective, many see no harm in this tactic; some may even see it as their duty. *See generally* Lawrence J. Fox, *Making the Last Chance Meaningful: Predecessor Counsel's Ethical Duty to the Capital Defendant*, 31 Hofstra L. Rev. 1181 (2003). Laudable or not, this tendency on the part of counsel seriously distorts our ineffective assistance jurisprudence; competent counsel are found ineffective because they effectively concede the point. Our jurisprudence then fills up with descriptions of perfectly adequate performance that is assumed to be deficient.

supposedly knew for sure there would be a penalty phase hearing. **[CT 798, 844, 864, 1160]**

Had this strategy succeeded, it would have been quite a coup. It almost *did* succeed; the trial judge had to think long and hard before ruling against the defense's motion to preclude aggravation evidence, and the California Supreme Court had to work hard to affirm. *Pinholster*, 824 P.2d at 618-20. We'll never know, of course, but the burden of proof, *Strickland*'s presumption of competence and AEDPA deference each require us to presume that the lawyers did the smart thing, not the dumb one.

The fact that Pinholster's lawyers tried to bar the state from putting on aggravation evidence does not mean they were not also preparing for the alternate possibility; their time sheets (such as we have) clearly show they were. This would explain why, when offered a continuance, the defense chose not to accept the offer. They had already done the necessary investigation and knew how they were going to proceed. If we "strongly presume," as *Strickland* commands, that the defense lawyers were competent, then they would have had no need for a continuance because they had already considered all the available possibilities and concluded that the best strategy was to put only Pinholster's mother on the stand.

This obviously isn't a view shared by the majority here, but that's because my colleagues view the case through the "distorting lens of hindsight." *Sims* v. *Brown*, 425 F.3d 560, 585 (9th Cir. 2005) (internal quotation marks omitted); *Turner* v. *Calderon*, 281 F.3d 851, 873 (9th Cir. 2002) (internal quotation marks omitted); *Hendricks*, 70 F.3d at 1036. If we step into the defense lawyers' shoes and look at the case from ground zero, the decision to rely on Pinholster's mother is entirely plausible, perhaps inevitable. It was certainly plausible enough that the California Supreme Court didn't *unreasonably* apply Supreme Court precedent by determining the lawyers were competent.

The majority seems to overlook the very difficult position defense counsel found themselves in after the jury came back with guilty. This wasn't a case where defendant sat doe-eyed at counsels' table looking sad and contrite while others spoke for him. Instead, he took the stand and protested his innocence aggressively and at length. While we don't have video of Pinholster's testimony, the transcript gives strong indications that he was arrogant to the point of smirking at the prosecution's questions. Equally important, the transcript reveals that he was lucid and entirely coherent. He presented himself as a violent and highly aggressive criminal. He claimed that he used only guns but then had to admit he had used knives in other crimes. He tried to snow the jury about his whereabouts on the night of the crime, but the jurors were not taken in. During the hour or two he testified, Pinholster doubtless made a deep impression on the jury and this would have made it difficult or impossible to "humanize" him in their eyes. Brainard and Dettmar were there to see all of this and their mitigation strategy was constrained by this reality. My colleagues see only a paper record.

Trial counsel were limited in their choices in other significant ways. They had hired a competent psychiatric expert, Dr. Stalberg, and his opinion was devastating:

> 1.  *When examined, Mr. Pinholster did not manifest any significant signs or symptoms of mental disorder or defect other than his antisocial personality disorder by history.* Although he allegedly has epilepsy, he has not been taking medication for the past year at County Jail and has not had a seizure. *Additionally, it does not appear that he suffers brain damage as he was cognitively intact on mental status examination.*
>
> He has a history of hyperactivity as a youngster and hospitalization at Camarillo State Hospital at the age of 14 for incorrigibility. He was not medicated

there and just received 90 day observation. He spent time in the Youth Authority and in various state prisons without requiring psychiatric treatment or medication.

He has a lengthy history of drug dependency of the narcotic variety, but *his drug dependency has not resulted in any brain damage*.

2. As for the alleged offenses, the defendant denies any involvement other than directing an individual to burglarize the residence with Mr. Pinholster collecting 1/3 of the money from sale of the stolen loot. *He is able to describe his actions on the night in question in great detail*, omitting of course any direct involvement with the victims. *It would not appear therefore he was significantly intoxicated or impaired on the night in question*.

Additionally, considering the statements attributed to the defendant by witnesses, it would also appear he was fully aware of what he was doing at the time of the offenses. He allegedly stated, "I'll take care of finding out where the dope is. I'll handle Kumar." This was some days before the offenses occurred.

*On the night of the offense Mr. Pinholster apparently planned his robbery and was aware of what he was doing*. This is by inference as he did not provide any subjective information other than his directing an individual to burglarize Kumar's home.

3. As for mitigation, *it does not appear Mr. Pinholster's epilepsy, hyperactivity as a child, or incorrigibility were related to the offenses except the incorrigibility reflects upon his psychopathic personality traits*. He was not under the influence of extreme mental or emotional disturbance, nor did he

have impaired ability to appreciate the criminality or conform his conduct to the requirements of the law. . . .

Also, because of Mr. Pinholster's personality dis- order it is likely *he would be recalcitrant and a security problem while in custody*.

**[ER 797-98]** (emphases added).

Years later, in 2002, when presented with the additional evidence gathered by habeas counsel, the same Dr. Stalberg found it of marginal significance and did not change his diag- nosis:

As set forth in my declarations of April 19, 1997; January 24, 2000; and June 5, 2001, the additional documents I have reviewed since 1997 did contain some information that *might conceivably* be mitigat- ing within the very broad definition of California Penal Code section 190.3(k). On the other hand, as I testified at my deposition in July 2001, the addi- tional materials I reviewed *did not alter my conclu- sion* that Mr. Pinholster suffers from Antisocial Personality Disorder, as that term is defined in the DSM-III.

**[ER 793]** (emphases added).

Given Dr. Stalberg's expert opinion, trying to develop a psychiatric mitigation case at the time of trial would have been extraordinarily difficult. He told the lawyers that Pinhol- ster was entirely sane and sober on the night of the murder and that, in general, he's a psychopath. Unlike un-rebutted evidence of brain damage or post-traumatic stress disorder, *Porter* v. *McCollum*, 558 U.S. ___, No. 08-10537, slip op. at 6-7 & nn.4-5 (2009) (per curiam), what Dr. Stalberg had to say would hardly have been the stuff of mitigation; most

likely it would have been aggravating. *Daniels* v. *Woodford*, 428 F.3d 1181, 1204-05 (9th Cir. 2005); *Gerlaugh* v. *Stewart*, 129 F.3d 1027, 1034-35 (9th Cir. 1997); *see also Graham* v. *Collins*, 506 U.S. 458, 500 (1993) (Thomas, J., concurring). Had Dr. Stalberg testified, *see* pp. 16165-68 *infra*, Pinholster would be here arguing that his lawyers were incompetent for putting him before the jury. *See, e.g.*, *People* v. *Hines*, 15 Cal.4th 997, 1064-65 (1997). Moreover, counsel practicing criminal law in California back then would have been aware of a number of capital cases where psychiatric testimony backfired with devastating effect. *See, e.g.*, *Harris*, 949 F.2d at 1505; *People* v. *Williams*, 44 Cal.3d 883, 934-35 (1988); *People* v. *Robertson*, 33 Cal.3d 21, 44 n.11 (1982).[11]

With no realistic possibility of a psychiatric mitigation defense, what could Pinholster's lawyers do? Unlike habeas counsel, who have years of time, unlimited resources and the power to conjure imaginary mitigation cases with which to mesmerize federal judges, trial counsel are stuck with the hard realities that are the lot of the trial lawyer. One such reality is the client's wishes and preferences. Pinholster did not testify at his own evidentiary hearing in district court, so we don't know first-hand what instructions he might have given

---

[11]*Harris* is especially instructive because of the uncanny parallels to *Pinholster*. Harris, like Pinholster, was charged with two murders and a robbery. Harris raised an alibi defense and testified during the guilt phase, admitting to robbery but denying the two murders. (Pinholster, too, admitted robbery.) At the penalty phase, Harris's mother and sister testified that he'd been born prematurely and had suffered abuse from his father because the father believed Harris was someone else's son. They testified that, as a result of this abuse, Harris suffered a head injury when his father knocked him off his high chair, an injury that resulted in "convulsions, blood coming out of his mouth, nose and ears." 949 F.2d at 1506. The jury also heard that "Harris's father[ ] tried to choke Harris with a table cloth . . . [and that he] beat Harris and other children 'into unconsciousness several times when they were kids,' and that Harris was abused from the time he was a little baby." *Id.* Harris's father "was eventually sent to prison for child abuse and molestation." *Id.* After hearing all this, the jury sentenced Harris to death and he was long ago executed.

his lawyers, but we do have a pretty good idea: The record contains the report of Sheryl Duvall, who was an investigator for Pinholster's first habeas counsel, a document the majority wrongly refuses to consider.[12]

Duvall interviewed Pinholster in July 1991, about 7 years after the trial. She reports that Pinholster, at that time, "[wa]sn't enthused about attempting to get a reversal on penalty alone" and "had instructed his trial attorney not to put on a penalty defense." **[Ex. 40-1]** Of course, it is entirely rational not to want to spend decades as an inmate in a maximum security prison, and quite a few capital defendants have chosen not to try to have death sentences "reduced" to life behind bars. *E.g.*, *Demosthenes* v. *Baal*, 495 U.S. 731, 732-34 (1990); *Gilmore* v. *Utah*, 429 U.S. 1012, 1013 n.1 (1976) (Burger, C.J., concurring). Pinholster's lawyers would have been entitled—maybe required—to respect that choice.

Duvall also reported that Pinholster's "most significant

---

[12]The majority shuts its eyes to this document because it is supposedly hearsay. Maj. op. at 16078-79. But Pinholster's own statements to Duvall aren't hearsay; they're an admission by a party-opponent, which the federal rules specifically exclude from the definition of hearsay. Fed. R. Evid. 801(d)(2). As for Duvall herself, her report was admitted as Exhibit 238 by stipulation. **[ER 1412]** Pinholster reserved no hearsay objection (or any other objection), so it is part of the record and there is no obstacle to considering it. *See United States* v. *Foster*, 711 F.2d 871, 877 (9th Cir. 1983). Pinholster, in fact, never objected on hearsay or any other grounds to the state's use of the Duvall report below; the hearsay argument was raised sua sponte by the district judge, who must have found the Duvall report inconvenient to deal with. **[ER 1449]** Petitioner does not defend the judge's hearsay ruling on appeal. There is something very wrong with the court sua sponte—and selectively—raising an objection that both parties have bypassed. If the Duvall report is hearsay and cannot be considered, why didn't the district court raise similar objections to other out-of-court statements, such as the declarations of Pinholster's siblings and the reports of Drs. Vinogradov and Olson? The parties obviously relied on mutual waiver of hearsay objections in order to streamline the hearing; we have no business upsetting that arrangement just to help out one side.

relationships appear to have been with his mother, step-father and maternal grandfather." The report continues:

> Scott told me he has always felt very close to his mother for whom he had nothing but praise. "She's always been supportive of all the kids. She's always the first there and the last to leave. She always had a hot dinner on the table." Further, Scott said to his knowledge his mother has never abused drugs or alcohol. She always treated her children kindly, was never abusive.
>
> Scott continues to stay in close contact with his mother. She visits him nearly every month in San Quentin. *Scott told me he was upset by his mother testifying at his trial.* He thought it was unnecessarily hard on her.

**[Ex. 40-3]** (emphasis added). Pinholster also reported that he had no recollection at all of his natural father, Garland.

And this is what Duvall revealed about Pinholster's stepfather:

> Bernice [sic] [Pinholster's mother] has told me Mr. Brashear [Pinholster's stepfather] abused her boys, particularly Scott, as they were growing up. Scott doesn't concur. He said while his stepfather was hard on them, in his opinion he and his brothers benefitted from Mr. Brashear's discipline—"it toughened us up." He had a home made paddle which he used freely on the boys. According to Scott, this worked to their benefit as they lived in tough neighborhoods so they needed to get used to rough treatment.

**[Ex. 40-3]**

Pinholster also had positive things to say about his grand-parents:

> When Scott was small Mr. and Mrs. Baumback [sic] had a chicken farm in Sunland. Scott used to spend his summers there. He and his grandfather were very close. Mr. Baumback [sic] was affectionate with the boys. He made them work hard on the farm but he was quick to praise their efforts. It seems that he made them feel good about themselves.

**[Ex. 40-4]**

Seen through the looking-glass of a quarter-century of hindsight pigs might fly, but in the here and now, when a lawyer has to make hard decisions about his client's case, not every theoretical possibility can be turned into a reality. Counsel can try to cajole or persuade, but experienced lawyers know that pushing a client too far can backfire. Pinholster was not enthusiastic about putting on a mitigation case, and he probably did instruct his lawyers not to do so, as he told Duvall. The lawyers may have persuaded him to let them put his mother on the stand, but he was reluctant and resentful. Still, the lawyers must have reminded him that everyone has a mother and the jurors may take pity on her even if they feel no pity for the son. Pinholster went along but, years later, he still didn't like it. That tells us something about the stiff resistance counsel could have expected from Pinholster had they proposed trashing his mother in open court, as the majority does today.

Is it possible, is it even conceivable, that Pinholster, who was not enthusiastic about life in prison, would have allowed his lawyers to put his estranged—and strange—relatives on the stand to tarnish his grandparents? To say that his stepfather was a monster, to besmirch his beloved mother as a selfish, uncaring, neglectful crone who wore mink while the children had no food? Even if Pinholster had allowed this—

and I can't imagine he would have—what *good* would it have done? It certainly wouldn't have worked for the mother to testify, and then to be followed to the stand by the sister, brother, son and daughter calling her a selfish liar. Such a family food fight would have done Pinholster only harm. Had the lawyers decided to go with the other relatives, and had Pinholster let them do so, they would have had to give up the mother, forfeiting the inherently sympathetic bond they hoped to establish between her and the jurors. It's not clear to me that this would have been a wise trade-off. *See* pp. 16161-63 *infra*.

If we assume, as the majority does, that Pinholster's lawyers were Laurel and Hardy, all such calculations might seem far-fetched. But we are required to presume—strongly presume—that the lawyers were competent, and we must look at the situation through their eyes. We know that the lawyers talked to Pinholster and his mother; they also talked to Pinholster's brother Terry and had a trial run at using him as a mitigation witness—with no success. *See* pp. 16124-25 *supra*. Not only did the jury disbelieve Terry's testimony, but the prosecutor managed to insinuate that he was the conduit of the first death threat against Art Corona. **[TR 6030]** Maybe my colleagues in the majority would put Terry the Enforcer on the stand to help "humanize" Pinholster and soften the jury in his favor, but a competent lawyer might think better of it. The other erstwhile family witnesses had serious disabilities too. Burnice's brother Keith was so estranged over an inheritance dispute that he didn't even know Pinholster was on trial for murder. Pinholster's sister had a serious criminal record.

**Volume 3 of 3**

One need only read the declarations and testimony of the various Pinholster relatives to see that they aren't exactly the Osmonds. A competent lawyer talking to Pinholster, his mother and Terry would have quickly figured out that parading the family members through the courtroom to snipe at each other would do Pinholster no earthly good. *See* pp. 16161-63 *infra*. Lawyers are hired to make those judgments and, best I can tell, Pinholster's lawyers called this one right. At any rate, we certainly can't say that the California Supreme Court was unreasonable for not second-guessing them. That one of Pinholster's lawyers, years after the trial, wouldn't offer tactical reasons for the defense team's choices, maj. op. at 16155-58, does not undermine the California Supreme Court's judgment. *See Strickland*, 466 U.S. at 688; *Murray* v. *Carrier*, 477 U.S. 478, 484, 487-88 (1986); p. 16131-32 n.9 *supra*.

The majority also forgets that there are no free-throws in criminal trials. *See Belmontes*, No. 08-1263, slip op. at 5-6, 10-12. If the defense has a witness testify about Pinholster's peaceable tendencies, then the state gets to cross-examine that witness about all of Pinholster's misdeeds. If Pinholster puts on evidence about his medical or mental problems, this opens the door to evidence that he's a remorseless psychopath. Pinholster's counsel faced a serious risk that a mitigation case could turn out to be aggravating. *See Belmontes*, No. 08-1263, slip op. at 2-3.

Burnice Brashear might not have been the ideal mitigation witness; then, again, Mother Theresa probably wasn't available. But a mother—one obviously devoted to her son, and vice versa—has a pretty good chance of arousing the jury's sympathy while not giving the prosecution many openings to

inflict damage through cross-examination or rebuttal. Burnice provided many details about Pinholster's head injuries, abuse by his step-father, problems in school, problems with his siblings, his being beaten badly in jail and she confirmed Terry's account of Pinholster's epilepsy. Sure, Burnice could have been more effective in her testimony, but not everyone is lucky enough to have Joan Crawford for a mother.

My colleagues miss the point entirely when they refer to Burnice's testimony as "misleading," "self-serving," "inaccurate" or "devastating." Maj. op. at 16076, 16077, 16081, 16085-86, 16088, 16098. The main point of Burnice's testimony was to create sympathy for herself and the other members of Pinholster's family in the hope that the jury would take pity on *them* and spare them the agony of losing a son and brother to the executioner. That's what's known as the "family sympathy" mitigation defense and other lawyers in California used it at the time. *People* v. *Cooper*, 53 Cal.3d 771, 801, 844 (1991); *In re Visciotti*, 14 Cal.4th 325, 336-37 (1996). Is this a perfect strategy? Probably not, but there probably *is* no perfect strategy for mitigating a bloody double-murder by a smug, violent and remorseless psychopath.

Defense counsels' strategy kept Pinholster's jury from coming back with a swift death verdict: The jury deliberated for two days before making its decision. Do my colleagues really think that Pinholster would have done better if his lawyers had put on the child-molesting sister, the extortionist brother, the persnickety aunt and the greedy uncle to tell the jury that Burnice was a terrible mother who deserved to see her son executed? A competent lawyer might think otherwise.

**3. Deference to the State Supreme Court.** The district court did not defer in the least to the California Supreme Court for the simple reason that it, and the parties, mistakenly believed that AEDPA deference did not apply. *See Calderon*, 163 F.3d at 540. No sooner had the district court finished its work than the Supreme Court disabused it of this notion in

*Garceau*. 538 U.S. at 206-07. But the district court refused to be disabused: It did not reconsider its ruling in light of AEDPA's clear mandate that we defer to the state courts—and their factual findings in particular—in all but the most unusual circumstances. We therefore owe the district court no deference at all. Rather, we should be suspicious of its findings as arrived at using the wrong standard and stubbornly persisted in despite clear contrary guidance from the Supreme Court. Unlike the Supreme Court in *Porter*, we don't have a reliable finding by a federal or state trial court that counsels' performance was deficient.

Perhaps led astray by the district court's cavalier attitude, the majority doesn't give much deference to the state court either. The opinion recites all the right verbal formulae, although it does twice denigrate the California Supreme Court's action as a "postcard" denial, maj. op. at 16055 n.3, 16099, suggesting perhaps that the state court didn't look at Pinholster's petition very closely or carefully and therefore isn't entitled to a full measure of deference.

In fact, it's abundantly clear that the California Supreme Court looked at this case closely. By the time it got Pinholster's first habeas petition, the justices were already familiar with his case. Only three years earlier, they had written an exhaustive opinion dealing with a host of issues in Pinholster's trial, including whether the state had given timely notice of a penalty-phase hearing. On receiving Pinholster's voluminous first petition, the justices did not dismiss it out of hand. Rather, they asked for a response from the state on three specific claims of ineffectiveness, all dealing with counsel's performance at the penalty phase. The state filed a response and petitioner filed a traverse. After this briefing was complete, the justices unanimously denied the petition on the merits, and some of the claims on procedural grounds. Justice Mosk would have denied the petition solely on the merits.

Although the process was more abbreviated for the second petition, the justices issued a reasoned order dismissing all

counts on substantive grounds and some on various procedural grounds. This time Justice Mosk was joined by Justice Brown in believing that the petition should be dismissed on substantive grounds only.

In light of this record, we are bound to presume that the denial of Pinholster's state petitions represented the reasoned view of the unanimous California Supreme Court. And we must then ask ourselves whether we can say that their collective judgment about the performance of two members of their bar was truly unreasonable. In doing so, we must keep in mind that the California Supreme Court not only is the ultimate arbiter of the conduct, performance and ethics of lawyers admitted to practice in the state, but that it has far more experience with IAC claims than we do. In the 15 years preceding Pinholster's habeas petitions, the California Supreme Court resolved no fewer than 177 such cases.

Based on their vast experience with criminal trials in general and capital trials in particular, the California justices had any number of reasons for finding that Brainard and Dettmar weren't incompetent. For example, they may have relied on cases where they'd held that "[a] defendant appearing in propria persona is held to the same standard of knowledge of law and procedure as is an attorney." *People* v. *Clark*, 50 Cal.3d 583, 625 (1990). If so, they would have held Pinholster responsible for failing to give his lawyers notice of the state's intent to hold a penalty-phase hearing, along with any resultant failure to adequately prepare for it.

The justices may have also reasonably believed that whatever continuance the superior court would have allowed after Pinholster's counsel were notified of the penalty phase would amount to, at most, a few days or a week; the jury that had just rendered the guilty verdict could not be forced to return many weeks or months later. So the court could have concluded that there just wasn't that much else a competent lawyer could have done in such a short time. Or the justices may

have believed that a lawyer is entitled to rely on a competent expert to request information if the materials provided by the lawyer are insufficient. And, as Dr. Stalberg did not ask for further materials in making his diagnosis, the court may have concluded that competent counsel were not required to provide any such additional materials. *E.g.*, *Turner*, 281 F.3d at 876; *Wildman* v. *Johnson*, 261 F.3d 832, 838 (9th Cir. 2001); *Harris*, 949 F.2d at 1525. Or the court may have had in mind the bad experiences of other defense lawyers who put on psychiatric testimony in capital cases around that time, and concluded that a lawyer who got an aggravating psychiatric report would be foolish to raise a psychiatric mitigation defense. *See, e.g.*, *Thompson* v. *Calderon*, 86 F.3d 1509, 1525 (9th Cir. 1996) (since overruled); *Hines*, 15 Cal.4th at 1064-65; *Williams*, 44 Cal.3d at 934-35; *Robertson*, 33 Cal.3d at 43 n.11.

The California Supreme Court acted much closer in time to the trial and generally has a much better feel for what is reasonably expected of a competent criminal trial lawyer in California. Having twice looked at Pinholster's claims of ineffectiveness, the justices—with not a single dissent among them—concluded that counsel were effective, or that Pinholster was not prejudiced, or both. It takes considerable hubris to say that all of the justices were not merely wrong, but so egregiously wrong that they *unreasonably* applied clearly established Supreme Court precedent. Justice Mosk, were he still with us, would be surprised and, I believe, hurt by such a suggestion.

**C.  The California Supreme Court did not twice unreasonably apply established Supreme Court precedent in concluding that Pinholster was not prejudiced by any deficiency on the part of his trial counsel**

Under the heading "Available Mitigation Evidence," the majority throws in every scrap of even potentially mitigating

evidence gathered by Pinholster's habeas counsel during the course of two decades of investigation and expert-shopping. Maj. op. at 16082-90. It then concludes that Pinholster was prejudiced because his trial counsel didn't present this evidence on his behalf. But much of the evidence the majority relies on isn't properly considered, either because it was not presented to the state courts or because it could not possibly have been found by diligent trial counsel back in 1984. Almost all the rest of the evidence *was* disclosed to the jury during the penalty phase.

At best, the majority focuses on some minor differences in emphasis that don't amount to a hill of beans. *See Van Hook*, No. 09-144, slip op. at 9. At worst, the majority dramatically overreads *Terry Williams*, *Wiggins* and *Rompilla*, cases that are irrelevant to the prejudice inquiry under AEDPA, in a way that will hamstring the states in our circuit for decades to come. The controlling case is *Visciotti*, and it clearly requires us to accept the California Supreme Court's determination that Pinholster wasn't prejudiced.

Below I review the mitigation evidence in the order listed by the majority.

**Organic Brain Damage.** There are three separate and independent reasons we may not consider the expert reports that purport to diagnose Pinholster with brain-damage-related mental illness caused by childhood head injuries. First, evidence of this supposed relationship was neither presented nor diligently pursued in the state courts. It was not presented in the first state habeas petition, which relied on Dr. Woods as the psychiatric expert, and it was not presented in the second state habeas petition, where Pinholster relied on Dr. Stalberg —who later let him down and testified for the state. Nor, for the reasons I explained earlier, was Pinholster diligent in developing the theories of Drs. Olson and Vinogradov. Thus, we can't consider them. *See* 28 U.S.C. § 2254(e)(2); *pp. 16134-36 supra*.

Second, petitioner has presented no evidence that a competent lawyer in 1984 could or would have found an expert to advance the theory that organic brain damage caused Pinholster to commit two cold-blooded murders. In fact, the record speaks loudly to the contrary: It wasn't until Pinholster's seventh legal team, 18 years after the trial, worked with a third set of psychiatric experts that they came up with this dubious theory.[13]

Moreover, Pinholster's trial lawyers *had* an expert, and a very good one: Dr. Stalberg. Pinholster thought so highly of him that he re-hired him as the expert for his second state habeas petition. Even when he fired Dr. Stalberg for coming up with the wrong opinion, Pinholster didn't dispute his competence. And what did Dr. Stalberg tell Pinholster's trial lawyers in very clear terms? Their client is sane, wasn't drug- or alcohol-impaired at the time of the murder and is a garden-variety psychopath. *See* pp. 16134-36 *supra.*

We and the California Supreme Court have clearly held that a competent lawyer may rely on the opinion of a competent expert and need not go expert-shopping until he finds one whose opinion he likes. *Harris*, 949 F.2d at 1525; *In re Fields*, 51 Cal.3d 1063, 1075 (1990); *People* v. *Grant*, 45 Cal.3d 829, 863 (1988); *Williams*, 44 Cal.3d at 945-46. So,

---

[13]The diagnosis proffered by Drs. Vinogradov and Olson is vigorously disputed by the state's experts, who cast serious doubt on the notion that any reputable psychiatrist would have reached the same diagnosis at the time of Pinholster's trial. Dr. Vinogradov's theory, in a nutshell, is that Pinholster must be suffering from brain damage caused by his childhood injuries because that is the simplest explanation for his behavior. **[ER 730-41, 1273-1316]** Neither she nor Dr. Olson performed a CT scan, MRI or any other test that actually showed the existence of brain damage, or suggested that such tests would have been available to reveal injuries at the time of trial. The state's experts held firmly to the view that Pinholster's childhood injuries weren't responsible for his antisocial behavior. **[ER 754, 795]** Indeed, Dr. Rudnick maintained that one of the two accidents caused no head trauma at all, injuring only Pinholster's shoulder and ear. **[ER 768]**

even if experts like Drs. Vinogradov and Olson *could* have been found in 1984, which petitioner has never proven, a competent lawyer would have had no duty to go looking for them. Until today, that was the settled law of our circuit. It should *still* be the law for AEDPA purposes because the United States Supreme Court has not held otherwise.

The majority might be under the mistaken impression that Dr. Stalberg would have come up with the organic-damage theory at trial if only he'd known about the head injuries, the epilepsy and all the other "mitigating" evidence that teams of habeas counsel have dredged up over the last two decades. But Dr. Stalberg *did* know about the head injuries (they are in the probation report the lawyers gave him) and about the epilepsy (he mentions it twice in his 1984 letter to Dettmar) at the time of trial, neither of which he thought was relevant. **[ER 798; Ex. 10-2]**

And what about the rest of the stuff that is supposedly so essential in assessing Pinholster's sanity? We need not speculate because Dr. Stalberg is here to tell us. He looked at it all and reached exactly the same diagnosis as in 1984: Pinholster is a sane psychopath. **[ER 793]** It's a pipe dream to imagine that a competent trial lawyer in 1984 who went to his competent expert with all this evidence and got this diagnosis would have nonetheless searched for (much less found) a Dr. Vinogradov to reach the opposite conclusion—all in the week or two the trial judge might have been willing to continue the penalty phase.

There is a third reason the majority shouldn't rely on Dr. Vinogradov's and Dr. Olson's evidence: It says it doesn't need to. Maj. op. at 16071. By representing that it would reach the same conclusion without their reports, the majority is holding that what remains is sufficient, standing on its own, to show that the California Supreme Court unreasonably applied *Strickland*. If this is what the majority means to hold, it should have the courage of its convictions and drop its dis-

cussion of the psychiatric evidence. It can only cause confusion in the law of the circuit for the majority to say in one part of its opinion that the psychiatric evidence is superfluous but then later rely so heavily on it.

In fact, the majority can't possibly let go of the psychological evidence because, once we remove the diagnosis that Pinholster suffers from trauma-induced mental illness, there is very little left with which to impugn the judgment of the lawyers, far less the judgment of the California Supreme Court.

Even if it were proper to consider this evidence, the majority gives it far too much weight by relying on law that has no place in a federal court's review of a state court decision under AEDPA. The majority's infatuation with the supposedly magical effect of evidence of organic mental illness, as opposed to merely psychological mental illness, *see* maj. op. at 16084-89, is another area where our court has gotten out in front of the Supreme Court. *But see* 28 U.S.C. § 2254(d)(1). I therefore need not engage the majority in a protracted debate about the wisdom of *Caro* v. *Woodford*, 280 F.3d 1247 (9th Cir. 2002), and *Douglas* v. *Woodford*, 316 F.3d 1079 (9th Cir. 2003). Nor need I argue that the en banc court should take this opportunity to overrule *Caro* and *Douglas*, although it should because there is no principled distinction between "organic" mental illness and "mental" mental illness. All I need point out is the undebatable: Under AEDPA, we may rely only on law clearly established by the Supreme Court. Circuit precedent, which is all *Caro* and *Douglas* are, isn't enough for granting relief under AEDPA. That the majority is unable to cite a single Supreme Court case in support of this distinction is itself proof that it has no lawful basis for reversing the California Supreme Court.

**Epilepsy.** The majority spends some time discussing epilepsy, and whether it was caused in childhood by Pinholster's head injuries or (as his mother speculated) as a result of a prison beating. It doesn't matter: Epilepsy is a seizure disor-

der. If not controlled by drugs, it causes the afflicted person to drop to the ground with stiff arms and legs, clenched fists and often foaming at the mouth. To those who have seen an individual in the midst of an epileptic fit, it is an unforgettable, scary experience. But when not in the throes of a fit, the individual behaves normally; it is not a mental illness and his faculties are not impaired.

No one has suggested, and it would make no sense to suggest, that Pinholster robbed, beat and stabbed two people to death while having an epileptic fit. Indeed, Dr. Stalberg, who interviewed Pinholster about the events on the night of the murders, remarked how good Pinholster's memory was and concluded that he hadn't been impaired or intoxicated. **[ER 798]** Dr. Stalberg knew of the epilepsy and mentioned it in his report, but observed it was irrelevant. And Dr. Stalberg tells us today that, even with all the new evidence, he stands by his original diagnosis. Trial counsel had educated themselves as to epilepsy as well, *see* p. 16125 *supra*, and must have been convinced it was a dead end. We're in no position to second-guess that judgment.

**Abusive and Deprived Childhood.** The majority tries to make Pinholster's childhood seem like hell on earth by using alarmist phrases like "abusive and deprived upbringing," maj. op. 16085, and "suffered extreme deprivation," maj. op. at 16088. The majority also tries hard to create the impression that the evidence presented on habeas was wildly different from what the jury heard, characterizing the mother's testimony as "misleading," maj. op. at 16076, 16082, 16088, and the testimony of the other family members as standing "[i]n stark contrast," maj. op. at 16086, and being vastly different from hers. Maj. op. at 16091. In fact, what's remarkable is how *little* support the family members provide for Pinholster's theory of extreme abuse and deprivation.

Pinholster's mother testified at trial that the punishment inflicted by her husband, Scott's stepfather, was "abusive or

near abusive." Maj. op. at 16086. In what the majority claims is "stark contrast," Pinholster's siblings testified that the step-father "frequently beat Scott while Scott was a child . . . . Bud [the stepfather] would use his fists, a belt, or anything else available, including on at least one occasion a two by four board." Maj. op. at 16087 (Terry Pinholster). And, "Scott as a child was frequently physically abused by Scott's step-father, Bud Brashear. Bud hit Scott with his fists as often as several times within one week. Bud's punishments were unpredictable and severe." Maj. op. at 16087 (Tammy Pinholster). While Pinholster's siblings give somewhat more detail than the mother, what they have to say is no different from—much less "in stark contrast" to—the mother's description. What they describe *is* abuse or near-abuse; their testimony confirms, rather than contradicts, the mother's testimony.

Then there is the suggestion that Pinholster's grandmother abused him because he looked like his father, whom Pinholster's grandparents despised. What's remarkable here is just how weak this testimony actually is. Both Pinholster's aunt and uncle make it clear that they are talking about nothing more than severe spankings. The aunt, Lois Fosberg, is quite explicit about this:

> Q:  "And at times, your mother would spank him?"
>
> A:  "Yeah."
>
> Q:  "How many times did you see your mother spank Scott?"
>
> A:  "Quite a few."
>
> Q:  "Can you give me an estimate?"
>
> A:  "No . . . . She was very rough with him and not so with the other ones."

Q: "And how did she spank him? Did she punch him or hit him with her palm, backhand him, or what?"

A: "Hit him with her hand or jerk his arm or—"

Q: "With her palm?"

A: "Yeah, things like that."

**[2 DT 53-54]**

The uncle also leaves no doubt that what the grandmother supposedly did to Pinholster was no more than spanking:

A: "[I]t occurred—often she would pick him up out of the playpen by one or two arms and just spank him across the back and butt and the legs. And I mean, more than once. I don't know how many times. It was enough to make an impression on me."

**[2 DT 125]** Pinholster himself says he enjoyed his summers at the grandparents' chicken farm; the grandfather "made [the children] feel good about themselves." **[Ex. 40-4]**

That's it—that's all the evidence of "abuse" that Pinholster's lawyers have been able to come up with after nearly two decades of digging and investigating.[14] Is what the record

---

[14]The majority also says that Pinholster's stepfather used a paddle on him, occasionally knocking him out. Maj. op. at 16087. This is not based on evidence in the record. It's a "fact" related by a psychiatrist's report that is based entirely on what Pinholster told him. **[ER 767]** While the psychiatrist can use the information he gathers as a basis for forming his opinion (which can then be undermined, to the extent the facts on which he relies are unsupported), his report can't be used to sneak into the record evidence that was not presented by the usual means, i.e., through sworn testimony subject to cross-examination. The majority is thus wrong to rely on this "evidence."

*does* support really a "stark contrast" with what Pinholster's mother had to say? To me, it seems like more of the same.

Pinholster himself describes the situation in terms much closer to those of his mother. *See* pp. 16138-39 *supra* (Duvall interview). Accusing Burnice of misleading the jury by providing an inaccurate picture of Pinholster's home situation is wholly unjustified. Had Pinholster's trial counsel decided to go that route, they might have been able to coax a bit more mileage out of some relatives, but would it really have given them something to suggest an "abuse excuse" for brutally murdering two strangers decades later? I don't think so.

Let's turn now to the majority's claim that Pinholster suffered "extreme deprivation." Maj. op. at 16088. The entire support for this version of events, which the majority for some reason believes to be "the truth," comes from the testimony of Pinholster's aunt and uncle, and mostly the aunt. Aunt and uncle were visitors to the household, but their declarations disclose that their observations were infrequent. The aunt makes a general statement that the children didn't get enough to eat, and supports it with a single instance where she saw them mixing flour and water. In the same breath, however, she says that the children were fed "canned food like spaghetti" and the kids would "start throwing food at each other during meals"—awfully strange behavior for starving children. **[ER 687]** In general, the aunt's testimony borders on the picayune, as she criticizes her sister for not disciplining the children sufficiently, for keeping a dirty house and for living in bad neighborhoods. One next expects her to accuse Burnice of forgetting to weed the lawn. The uncle testifies only that his sister (Pinholster's mother) took good care of herself while the children looked like ragamuffins; he says nothing about food. **[ER 682]** If this is "extreme deprivation" then there are few defendants in the criminal justice system who are not extremely deprived and deserving of a pass.

Neither of Pinholster's siblings, who spent far more time in the house than his aunt and uncle, say that they didn't get

enough to eat or that they suffered economic deprivation. Indeed, Pinholster himself says exactly the opposite, praising his mother for always having a hot meal on the table. *See* p. 16139 *supra* (Duvall interview).

The simple fact is, there's nothing supporting the theory of abuse or deprivation, in stark contrast to the evidence in many other cases. There was no evidence of broken bones, concussions, bleeding, hospitalization or any kind of serious or lasting injury resulting from Pinholster's so-called abuse. *E.g.*, *Wiggins*, 539 U.S. at 517; *Terry Williams*, 529 U.S. at 370; *Harris*, 949 F.2d at 1505-06. Pinholster's father didn't try to shoot him. *Porter*, No. 08-10537, slip op. at 4. None of the children were gang-raped. *Wiggins*, 539 U.S. at 517. In fact, there was no evidence of incest or any kind of sexual abuse. *E.g.*, *id.*; *Hendricks*, 70 F.3d at 1037. Nor was there evidence that the children had to be removed from the home and placed in foster care because they were abused or neglected. *E.g.*, *id.*; *Terry Williams*, 529 U.S. at 395. There was no evidence that either parent was convicted of child abuse or neglect, or was even charged with such behavior. Terry Williams, 529 U.S. at 395; *Harris*, 949 F.2d at 1506. Home wasn't a "combat zone." *Van Hook*, No. 09-144, slip op. at 7. There was no evidence that the children were exposed to promiscuous sex by the parents, were encouraged or forced to commit crimes to sustain themselves or were denied the basic necessities of life. *E.g.*, *id.*; *Wiggins*, 539 U.S. at 517; *Moore* v. *Johnson*, 194 F.3d 586, 613 (5th Cir. 1999). The children weren't locked "in a small wire mesh dog pen that was filthy and excrement filled." *Rompilla*, 545 U.S. at 392. Pinholster didn't grow up in a one-bedroom house described as a "chicken coop." *Belmontes*, No. 08-1263, slip op. at 6. The children didn't live in a home where "someone had had a bowel movement" several places on the floor and "[u]rine was standing in several places in the bedrooms." *Terry Williams*, 529 U.S. at 395 n.19. The parents didn't violently assault each other in front of the children. *In re Visciotti*, 14 Cal.4th at 336. Pinholster's father didn't beat his mother so severely that she was hospitalized

and lost a baby. *Porter*, No. 08-10537, slip op. at 4. There's no evidence the children had to be hospitalized for drinking when they were very young. *Terry Williams*, 529 U.S. at 395 n.19.

It is true that the family was poor; the stepfather was abusive; the mother was more permissive than some would condone; and some of the familial bonds were not particularly warm or caring. But there is absolutely nothing in this record that suggests Pinholster's experience growing up differed from that of millions of other young men from broken homes with parents who have a hard time making ends meet. Hyperbolic language cannot force from the record something it doesn't contain. And what it doesn't contain is anything that could conceivably have swayed a jury to go easy on Pinholster because of his childhood.

We must remember that this jury had just convicted Pinholster of two brutal murders and heard convincing evidence that this was just the last in a long pattern of brutal crimes. He had previously broken his wife's jaw, seriously wounded someone with a straight-razor, kidnapped someone else at knife-point and on multiple occasions kicked, spit and thrown bodily fluids on police officers. He proudly admitted to having committed hundreds of robberies at gunpoint. The jurors also heard that Pinholster *twice* threatened the life of key prosecution witness Art Corona, most recently just a few days earlier. When Sgt. Barrett saw Pinholster after he returned from court, Pinholster boasted that he'd snowed the jury on the murder charge and "when he got out he'd have to kill [Art Corona]." **[TR 7384-85]** *Van Hook* reminds us that we must focus on the weight of the aggravating factors, not merely on their number. No. 09-144, slip op. at 10. Would these jurors, who had just convicted Pinholster of a double murder, take a chance that this uncontrollably violent defendant would make good his threat to arrange for the murder of Art Corona? Not bloody likely.

**Family Criminal and Mental History.** As the majority recognizes, Pinholster's mother did disclose that her other children had difficulties with the law, difficulties with drugs and alcohol and that Tammy had engaged in self-destructive behavior. Beyond that, the record on habeas does go into more depth regarding the mental, substance-abuse and criminal problems of the Pinholster siblings and of his biological father.

Whether, and to what degree, this is mitigating is highly debatable. Perhaps a mental health expert might have argued from this evidence that Pinholster suffered from some genetic mental defect, but none here have. As noted, Dr. Stalberg always believed Pinholster was fundamentally a sane psychopath. The same is true of Drs. Rudnick and Geiger. Drs. Olson and Vinogradov, whose evidence we may not consider, *see* pp. 16109-12 *supra*, believed that Pinholster's "organic personality syndrome" was induced by childhood head trauma which, of course, cannot possibly be inherited and thus bears no relationship to whatever mental problems his siblings had. He never knew his biological father, so any bad behavior on the father's part wouldn't have affected the son. *See* p. 16138 *supra* (Duvall interview). And, of course, providing evidence that Pinholster's brother and sister are nuts would have undermined their usefulness as abuse and neglect witnesses.

Without a psychiatric expert to relate the mental and substance-abuse problems of Pinholster's siblings to his behavior, this evidence could have just as easily been aggravating as mitigating—more likely the former. As experienced trial lawyers know, jurors are not always in a forgiving or generous mood, especially after they have just convicted a defendant of multiple first-degree murders. Having learned that all of his siblings and his biological father suffered from mental problems, they might well have concluded that Pinholster was a bad apple from a bad tree and there was no hope for rehabilitation or redemption. It's not as if such ideas are

unheard of, even in the pages of the United States Reports. *See, e.g.*, *Buck* v. *Bell*, 274 U.S. 200, 207 (1927).

**Pinholster's Substance Abuse.** Much of Pinholster's history of substance abuse was newly presented on habeas, although the jury did hear some of it through his brother Terry's testimony during the guilt phase. We've held before that "juries are unlikely to favor defenses based on abuse of dangerous drugs in evaluating a defendant's culpability for violent behavior." *Mayfield* v. *Woodford*, 270 F.3d 915, 931 n.17 (9th Cir. 2001). Telling the jury a lot more about what a druggie Pinholster was would probably have hurt him rather than helped him.

There is no evidence, much less clear and convincing evidence, that Pinholster's substance abuse had anything to do with his actions on the night of the murders. At the end of the trial, after the jury returned its death verdict, the trial court made certain findings, including the following: "[T]he defendant's capacity to appreciate the criminality of his conduct and his capacity to conform his conduct to the requirements of law were in no way impaired as a result of mental disease, defect, or the effect of any intoxicants or drugs or a combination thereof." **[CT 1185]** Under AEDPA, this finding is entitled to a presumption of correctness and can only be overturned if Pinholster rebuts it by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

\* \* \*

So here is where we stand with the mitigation evidence:

| Evidence Heard by the Jury |
| --- |
| Pinholster's stepfather was abusive, or nearly so. |
| Pinholster was in boys homes and juvenile halls after |

age 10 or 11.

Pinholster's mother ran over him with a car at age 2 or 3, badly injuring his head and requiring treatment at a hospital.

At age 4 or 5, Pinholster was in a car accident where he flew through the window and hit his head badly.

Pinholster started failing at school in the first grade, and has learning problems dating back to kindergarten.

In third grade, Pinholster's teacher suggested that he was "something more than just a disruptive child."

In third or fourth grade, Pinholster was sent to a class for emotionally handicapped children where his performance improved.

Pinholster had a difficult childhood, often getting into fights with his brothers.

A psychiatrist recommended Pinholster be hospitalized at age 10.

At age 12, Pinholster was institutionalized for six months in a psychiatric hospital.

Throughout childhood Pinholster stole things and had a blustery personality.

At age 18, Pinholster was badly beaten in jail.

Pinholster's personality changed after he was imprisoned in his late teens; he became withdrawn and had difficulty adjusting to life on the outside.

Pinholster has epilepsy, for which he's taken medication, and has had several serious seizures.

The Pinholster siblings had trouble with drugs and alcohol, and his sister was a self-destructive wild girl.

Pinholster's brother Alvin died and was in consider-

able trouble with the law.

Pinholster's family "sticks close together like you would not believe."

Pinholster was intoxicated on the night of the murders.

---

**New Evidence on Habeas That Was Not Presented to the State Courts**

The diagnosis of organic brain damage promoted by Drs. Vinogradov and Olson.

Testimony from Pinholster's uncle about his childhood and Pinholster's mother and grandparents.

---

**New Evidence on Habeas That Was Presented to the State Courts**

Pinholster's aunt thought that his mother was selfish and neglectful, a poor housekeeper, a poor disciplinarian and deprived the children of proper nutrition.

Pinholster's grandmother spanked him, possibly for looking like his biological father.

Alvin's death was by suicide.

Pinholster's biological father may have been mentally ill.

A teacher found Pinholster's mother unreceptive to guidance about how she should handle his learning disabilities and emotional problems.

---

Only the evidence in the third category was not presented to the jury but could have been. There just ain't much there.

I suppose counsel *could* have presented this evidence, but one thing is clear: It would not have been possible to present

the mother's testimony, which painted a relatively rosy picture of the family, and particularly her role in it, and also the testimony of the brother, sister, aunt and uncle, which painted their family life as terrible and the mother as neglectful and selfish. Assuming that counsel had all this evidence available to present at the penalty phase, they would have had to make a choice: They could go with the mother and try to develop sympathy for her and the family, or they could paint Pinholster's parents as villains and try to work up sympathy for him personally. They absolutely could not do both without having the sides collapse on the middle; the two approaches are not "consistent . . . theor[ies] of mitigation." *Porter*, No. 08-10537, slip op. at 15.

Now let's consider the situation counsel found themselves in. The jury had just convicted their client—a white supremacist gang member who boasted of having little regard for others and of committing hundreds of armed robberies—of two bloody murders. He had lied to the jury on the stand and generally behaved badly. His testimony would have given the jury a pretty good impression of who they were dealing with. They had also heard, and were about to hear more, about Pinholster's long history of violent and abusive behavior towards just about everyone. The jurors had also heard that Pinholster had threatened prosecution witness Art Corona in an effort to keep him from testifying. Pinholster's own competent psychiatrist was telling his lawyers that their client was sane and sober at the time of the crime and committed the crime because he's a violent psychopath. For reasons I explained earlier, it's not irrational or incompetent for lawyers in that situation to conclude that it would be best to have the mother paint a rosy picture of Pinholster's family life and herself as a mother, in hopes that the jury would take pity on her and spare her son's life to avoid causing her and the rest of the family additional pain.

My colleagues disagree. They believe that there is only one strategy here, namely trying to "humanize" the defendant by

trashing the mother and stepfather. I think they're wrong. But let's apply the *Belmontes* methodology anyhow, No. 08-1263, slip op. at 5-6, 10-11, turn the clock back to 1984 and try to figure out how far Pinholster's lawyers could have gotten with trying to humanize him.

Imagine this: Counsel leave off the mother and lose whatever sympathy she may have gained for Pinholster. They put on the persnickety aunt who criticizes her sister for neglecting the kids, for failing to discipline them, for looking after herself while the kids were wearing rags and not giving them enough to eat. She also says that the grandmother spanked Pinholster very hard because he looked like his father. They put on Terry—the brother who may have delivered the threat to Art Corona—to say that the stepfather was violent and Pinholster caught the worst of it, and they put on the sister to say the same. Then they put on evidence that their own mitigation witnesses (the brother and sister) suffer from mental illness and are drug addicts and child molesters. And they put on the teacher to say that Pinholster was bright and she recommended mental treatment, but the evil mother didn't listen to her.

Beyond this it gets difficult. They have no commanding officer to testify to Pinholster's decorations and valor during "two of the most critical—and horrific—battles of the Korean War." *Porter*, No. 08-10537, slip op. at 12. Pinholster's personal troubles didn't result from trauma he suffered while shedding blood for his county. *Id.* at 14. There is no evidence that Pinholster "struggle[d] to regain normality," *id.* at 12, or that he ever did anything at all to turn away from a life of crime, violence and abuse of everyone he came in contact with. Pinholster's is not "a crime of passion" or one motivated by "emotionally charged, desperate, frustrated" desire. *Id.* at 3. Pinholster did not commit these murders in a drunken stupor. *Id.* at 2-3. Rather, Pinholster's murders grew out of a long-planned burglary, driven entirely by economic motives, and he robbed his victims before stabbing them to death. He

doesn't own up to the crimes by pleading guilty, *id.* at 2, but brazenly lies to the jury, claiming that this just isn't his type of crime because he likes guns. Counsel can't point to anything Pinholster has done in his life that was useful, constructive, generous or courageous—nothing at all that might redeem him in the eyes of a rational juror.

Nor do counsel have a psychiatric expert who can testify that Pinholster suffers from mental illness and there's no evidence that such a mental health expert even existed in 1984. So they have to go forward without an expert, in which case they have very little. Or they can go forward with the expert they do have—Dr. Stalberg.

So let's say they put on Dr. Stalberg to tell the jury that there is a bunch of mitigating evidence from Pinholster's past. So far, so good. But the prosecution then gets to cross-examine Stalberg, and it goes something like this:

> Prosecutor: Dr. Stalberg, based on your examination of the defendant, did you form an opinion as to whether he suffers from a mental illness?
>
> Dr. Stalberg: Yes I did.
>
> Prosecutor: Did you diagnose him as being bipolar?
>
> Dr. Stalberg: No, I did not.
>
> Prosecutor: Is he paranoid?
>
> Dr. Stalberg: No.
>
> Prosecutor: Is he a schizophrenic?
>
> Dr. Stalberg: No, he's not.

Prosecutor:    Does he suffer from any other recognized form of psychosis?

Dr. Stalberg:   No, he does not.

Prosecutor:    Would you say that he is completely sane?

Dr. Stalberg:   As sane as you and me.

Prosecutor:    And do you believe he was sane on the night of the murders?

Dr. Stalberg:   Yes I do.

Prosecutor:    Did you form an opinion about whether he was impaired by drugs or alcohol on the night of the murder?

Dr. Stalberg:   Yes I did.

Prosecutor:    Was he?

Dr. Stalberg:   It is my professional opinion that he was not.

Prosecutor:    Dr. Stalberg, you testified that Mr. Pinholster suffers from epilepsy?

Dr. Stalberg:   I believe he may have suffered from epilepsy sometime in the past. There have not been any recent manifestations.

Prosecutor:    Do you believe he suffered an epileptic fit on the night of the murders?

Dr. Stalberg:   I have no reason to believe this.

Prosecutor: Would suffering from epilepsy impair his mental faculties, the same as schizophrenia or paranoia might?

Dr. Stalberg: No it would not.

Prosecutor: Can epileptic fits be faked?

Dr. Stalberg: Very easily.

Prosecutor: Is it possible to tell a real epileptic fit from a fake one?

Dr. Stalberg: Perhaps a doctor could, but I doubt most lay people would be able to tell the difference.

Prosecutor: Did you form any other professional opinion as to Mr. Pinholster's mental condition?

Dr. Stalberg: Yes I did.

Prosecutor: And can you tell us what that is?

Dr. Stalberg: He has antisocial personality disorder.

Prosecutor: Is that what's known, in common speech, as being a psychopath?

Dr. Stalberg: Yes it is.

Prosecutor: And what does this mean?

Dr. Stalberg: It means he feels no empathy for the suffering of others. He has no conscience.

> Prosecutor:  Thank you very much. You may step down.

Counsel, of course, would have known that if they opened the door to psychiatric evidence, the state would be entitled to put in such evidence as well. So, if Pinholster put on Dr. Stalberg, the state would have presented its own expert, someone like Dr. Geiger, who examined petitioner on June 19, 1984, and gave his diagnosis as follows:

> The subject was not impaired by mental disease or defect in such a way that he could not appreciate the criminality of his conduct or conform his conduct to the requirements of the law. *This man's conduct showed a high degree of cruelty, callousness and viciousness.* . . . DIAGNOSIS: Antisocial personality disorder . . . . CONCLUSION: This diagnosis is related to the commitment offenses in the sense that this man showed no responsible regard for the reasonable rights of other people and throughout the many years prior to this most recent conviction this character trait was apparent. **[Ex. 41]** (emphasis added).

Given this reality, competent counsel, as in *Belmontes*,[15] would have been careful to avoid any possibility that the state would put in such damaging psychiatric evidence, and so would have been forced to make do without Dr. Stalberg. That would have left counsel with only the brother, the sister, the aunt, the uncle—all sniping at each other while trashing Pinholster's mother, grandparents and step-father—and the school teacher.

---

[15]The opinion's paean to counsel's performance in *Belmontes*, maj. op. at 16098-99, must come as a surprise to certain members of the majority who are particularly familiar with that case. Then again, such recharacterizations of a matter in a habeas case are not so uncommon. *Belmontes*, No. 08-1263, slip op. at 7.

This assumes, for the sake of argument, that Pinholster would have allowed a mitigation defense which publicly disgraced his mother and stepfather. Is this likely to have led even a single juror to change his mind about the penalty? I seriously doubt it. Far more likely, the jury would have seen this as just one more effort by Pinholster to manipulate them, like his lying and self-aggrandizing on the stand.

The Superior Court here made findings about the weight of the aggravating evidence: "The Court finds that the evidence concerning the truth of the Special Circumstances is *overwhelming*, and the jury's assessment of the evidence that the aggravation outweighs the mitigation as to the selection of the proper penalty to be 'death,' is supported *overwhelmingly* by the weight of the evidence." (emphases added). **[CT 1184]** "Considering all of the evidence, the Court finds that the factors in aggravation *beyond all reasonable doubt* outweigh those in mitigation." (emphasis added) **[CT 1186]** These are the findings by the judge who saw the entire trial and the jury that convicted Pinholster; neither was set aside on appeal or otherwise. Under AEDPA these findings are entitled to a near irrebuttable presumption of correctness. In light of such overwhelming evidence, it would be impossible to conclude that even one juror would have been swayed by this paltry showing.

My colleagues disagree, but that's not the test. What we should ask is whether the justices of the California Supreme Court unreasonably applied clearly established Supreme Court precedent in concluding otherwise. My colleagues hold that they did by comparing the mitigating evidence here with that in *Terry Williams*, *Wiggins* and *Rompilla*, but those cases are not on point because not a single one of them required the Court to hold that a state court's determination on prejudice was unreasonable. Rather, in each case, the Court reviewed a state court decision that either applied a standard contrary to Supreme Court precedent or failed to address prejudice at all. *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534; *Terry*

*Williams*, 529 U.S. at 395-96. Comparison with the facts of those cases is irrelevant because the Court there wasn't required to apply AEDPA deference. The same is true of *Belmontes* and *Van Hook*, both of which resulted in summary reversals even under pre-AEDPA law.

The case on point is *Visciotti*, which did involve a state court determination regarding prejudice, to which the Supreme Court unanimously deferred. 537 U.S. at 22-27. The majority mishandles *Visciotti* as well. It doesn't matter whether we think the prejudice here is probably greater than in *Visciotti*; the Court did not say that *Visciotti* was a particularly close case, nor were there differing views about how *Visciotti* should come out, so nothing can be learned from that comparison. Indeed, *Visciotti* was a summary reversal, which tells us the Court didn't even think the case was close enough to merit argument. *Visciotti* thus hardly marks the outer boundary of what deference the Supreme Court believes we owe state courts in deciding whether a criminal defendant was prejudiced by ineffective assistance of counsel.

*Visciotti* is actually remarkably similar to our case. The same California Supreme Court decided Pinholster's second habeas petition as Visciotti's state habeas petition; they were decided by the state supreme court about 10 months apart. In *Visciotti*, as in our case, the defense lawyer chose to rely on the family sympathy defense rather than "humanizing" the defendant because "[i]t was his opinion that any attempt to gain sympathy for petitioner would have failed." *In re Visciotti*, 14 Cal.4th at 334. Counsel therefore did not pursue—and was not aware of—a large "trove" of facts like the majority believes is the case here.

At the federal habeas hearing, Visciotti presented evidence of the

> discordant atmosphere in the Visciotti family home created by an unending series of physical and verbal

confrontations between petitioner's parents; physical punishment of petitioner and his siblings; threats of violence; impermanence caused by the family's numerous moves and its impact on school attendance and the ability to make lasting friendships; the children's efforts to escape the household turmoil by hiding, leaving the house, early marriage, and resort to drugs as "self-medication." Social workers, psychologists, and other witnesses testified regarding the impact of these events on petitioner's development and ability to function in society.

*Id.* at 336. Visciotti's lawyer explained his strategy as follows:

He decided prior to jury selection in the Visciotti trial, when he saw petitioner's videotaped reenactment of the murder, that he would attempt to elicit sympathy for petitioner's family as his penalty phase strategy. He believed that, although sympathy for petitioner could not be expected, sympathy for petitioner's parents might be. His defense would therefore suggest that the parents were nice people whose son should not be killed.

*Id.*

While the California Supreme Court justices were thrice unanimous as to Pinholster—once on direct appeal, twice on habeas—they were twice divided in Visciotti's. Notably, Justice Mosk, who wrote the opinion in Pinholster's direct appeal, dissented on the IAC issue in Visciotti's direct appeal and was in deep dissent on Visciotti's habeas petition; he even invited the federal courts to set aside the death sentence. *Id.* at 359-62 & n.1. Justice Brown also dissented, and explained —in terms not so different from those employed by the majority today—the many ways in which Visciotti's lawyer failed him, and how this must have prejudiced him:

The penalty phase proceedings against petitioner, the subject of this court's order to show cause, are a textbook example of a process gone awry. Simply put, Agajanian [Visciotti's lawyer] failed petitioner at *every* stage of the proceedings. I offer several of many, many examples that could be given.

During his pretrial preparation, Agajanian "did not send for the police report [of the Cusack incident] or go through the prosecutor's file to read it in advance of trial and thus was surprised and unprepared to face that [aggravating] evidence." Likewise, he "failed to investigate and discover mitigating evidence as a result of his ignorance of the types of evidence a jury might consider mitigating."

During the penalty phase of the trial itself, Agajanian "failed to present readily available evidence that would have revealed to the jury the extent to which petitioner was subjected to psychological and physical abuse as a child, the impact the dysfunctional and peripatetic family life had on petitioner's development, and the correlation between these events and petitioner's resort to drugs." Also during the penalty phase of the trial, Agajanian "delivered an unfocussed closing argument, during which he undercut his client's own case by telling the jury that the evidence of petitioner's mental and emotional problems was not mitigating."

. . . .

In the context of the penalty phase of the trial, it is clear that Agajanian "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." This court had it all wrong when, on direct appeal, it characterized Agajanian's penalty phase closing argument as "a rambling discourse, not tied

to particular evidence." In fact, during the course of the so-called "rambling discourse," Agajanian systematically conceded nine of the eleven aggravating and mitigating factors set forth in Penal Code section 190.3 to the prosecution.

Agajanian conceded "[t]he facts and circumstances of the case in my opinion do not have to be reviewed. There is no way to make light of those types of things just like there's no way to make light of any kind of murder, whether or not there's a robbery involved . . . ." He conceded "past violence" was a factor in aggravation. He conceded "[w]ith respect to the prior conviction for assault with a deadly weapon, there's no way to make light of that either." He conceded "[w]ith respect to emotional disturbance, there's no evidence of that. That isn't even a factor to be considered." He conceded "[w]ith respect to the next one . . . victim participated or consented. That's not applicable. There's no evidence of that." He conceded "same situation" with respect to justification. He conceded "[e]xtreme duress, there was no evidence of that either. Although defense lawyers would like to have that present, it's not fair." He conceded "with respect to diminished capacity, when you ladies and gentlemen returned this verdict of first degree murder and found special circumstances, you indicated to all of us that you did not find diminished capacity. So if you did not find diminished capacity, how can I argue that as a factor of aggravation or mitigation? It just does not apply. It's not there." And he conceded "the indication here was that [petitioner] was not an accomplice or that his participation was minor-exactly the opposite. [Petitioner] is, as the People said, the trigger man."

Certainly, as the majority states, "[t]he aggravating factors were overwhelming" and the mitigating

factors were "minimal in comparison." Even in such a case, though, counsel must hold the prosecution to its heavy burden. Agajanian did not rise to the occasion. Although his abortive attempts to construct a family sympathy defense exposed some of the mitigating evidence to the jury, Agajanian undermined its effectiveness by "conceding that the jury could find that all of the possibly aggravating factors were present, and none of the mitigating." Indeed, the referee specifically found, and the majority agrees, that Agajanian "had no intention of introducing any evidence in an attempt to draw sympathy to his client."

*Id.* at 364-66 (internal citations and footnote omitted). According to Justice Brown, Agajanian did far more damage to Visciotti's case than Brainard and Dettmar did to Pinholster's.

No doubt swayed by the strong dissents of these well-respected state justices, the district court granted habeas and we affirmed. The United States Supreme Court was not impressed:

The [Ninth Circuit] Court of Appeals disagreed with [the majority of the California Supreme Court,] suggesting that the fact that the jury deliberated for a full day and requested additional guidance on the meaning of "moral justification" and "extreme duress" meant that the "aggravating factors were not overwhelming." Perhaps so. However, under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. The federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state-court decision is objectively unreasonable. It is not that here. Whether or not we would reach the

same conclusion as the California Supreme Court, we think at the very least that the state court's contrary assessment was not unreasonable. Habeas relief is therefore not permissible under § 2254(d).

*Visciotti*, 537 U.S. at 26-27 (internal citations and quotation marks omitted).

In our case, unlike *Visciotti*, the *same* state supreme court justices were unanimous in denying the habeas petition. As *Visciotti* shows, this was not a court whose members played "follow the leader." Justices Mosk and Brown clearly had minds of their own; Justice Kennard wrote separately to explain why she agreed with the majority. *In re Visciotti*, 14 Cal.4th at 357-59. But in Pinholster's case they were unanimous, with the firebrand dissenter, Justice Mosk—who had spent decades on the California Supreme Court championing the rights of criminal defendants—fully on board. Indeed, Justices Mosk and Brown *did* show a difference of opinion in Pinholster's case; they both would have denied the petition entirely on the merits and not on procedural grounds as well. **[Exs. B, C-7]** One can't say this was a case where the justices brushed aside the habeas petitions without giving them their full attention.

Putting Pinholster's case next to Visciotti's, how can we possibly say that the California Supreme Court unreasonably applied established Supreme Court precedent in the former, when a unanimous Supreme Court summarily reversed us for saying that in the latter? The cases are remarkably similar, down to the fact that the trial lawyer in both cases was disbarred after the trial. Pinholster's lawyers were no worse than Visciotti's and probably better; at least they didn't concede nine of the eleven aggravating and mitigating factors set forth in the death penalty statute. Can we truly say that we are giving Pinholster's state habeas determination on prejudice the same degree of deference that the unanimous Supreme Court gave to Visciotti's case? I think not.

**Conclusion**

The trial in this case took place over a quarter century ago. Pinholster's lawyers are both dead. Justice Mosk, who wrote the California Supreme Court's unanimous opinion in Pinholster's direct appeal and participated in both of his habeas petitions, is also dead. Pinholster's two victims are long dead and forgotten; whatever hopes and aspirations they may have had were cut short because they had the misfortune of getting in the way of Pinholster's greed and anger.

Meanwhile, prison has been good to Pinholster. He sits in his cell reading Machiavelli, Voltaire "and all the philosophers" **[ER 704]**, drawing pictures to sell over the internet. He enjoys the gravitas, authority and mentoring opportunities that come with being an elder in his prison gang, and has surgery performed on his knees at taxpayer expense. He still stabs people whenever he can, without passion or regret; "it was just business," he explains. **[ER 704]** His conscience doesn't trouble him about the fact that he took the lives of two fellow human beings; he has never expressed the least remorse for his killings. The people of California are entitled to put an end to Pinholster's paid vacation and insist that the punishment lawfully imposed on him be carried out.

I have no doubt that my colleagues sincerely believe they are following the Supreme Court's directions. Admittedly, the Court has been less than clear in this area. *See, e.g.*, *Rompilla*, 545 U.S. at 377 (majority), 395 (Kennedy, J., dissenting); *Wiggins*, 539 U.S. at 514 (majority), 538 (Scalia, J., dissenting); *Terry Williams*, 529 U.S. at 367 (majority), 416-17 (Rehnquist, J., dissenting). But I believe it's been clear enough, and Pinholster's death sentence must be reinstated. If we do not do it ourselves, it will surely be done for us.